| For the United States: | For the PAISD: |
|---|---|
| /s/ Wm. Bradford Reynolds | /s/ Clyde Gott |
| Wm. Bradford Reynolds<br>Assistant Attorney General<br>Civil Rights Division<br>Department of Justice<br>Washington, D.C. 20530 | Dr. Clyde Gott<br>Superintendent<br>Port Arthur Independent<br> School District<br>Port Arthur, Texas |
| /s/ Thomas M. Keeling | /s/ A. Z. McElroy |
| Thomas M. Keeling<br>Attorney<br>Civil Rights Division | President<br>Port Arthur ISD Board of<br> Education |
| /s/ Gregg Meyers | /s/ Banker Phares |
| Gregg Meyers<br>Attorney<br>Civil Rights Division | Banker Phares<br>Attorney<br>Phares, Phares & Bass<br>2933 Park Place Plaza<br>Port Arthur, Texas 77640 |

David R. RUIZ, et al.,
Plaintiffs-Appellees,

United States of America,
Intervenor-Appellee,

v.

W. J. ESTELLE, Jr., et al.,
Defendants-Appellants.

Nos. 81–2224, 81–2380 and 81–2390.

United States Court of Appeals,
Fifth Circuit.

June 23, 1982.

Mark White, Atty. Gen. of Tex., Ed Idar, Jr., Douglas M. Becker, Kenneth L. Petersen, Jr., Asst. Attys. Gen., Pike Powers, Lee C. Clyburn, Austin, Tex., William R. Pakalka, Jerry E. Smith, Houston, Tex., Keith A. Jones, Washington, D.C., for defendants-appellants.

Donald W. Jackson, Edward J. Landry, Asst. County Attys., Houston, Tex., for Heard.

William Bennett Turner, Donna Brorby, San Francisco, Cal., Steven L. Winter, Joel Berger, Jack Greenberg, New York City, Samuel T. Biscoe, Dallas, Tex., for Ruiz, et al.

Jim D. Wiginton, Angleton, Tex., San Francisco, Cal., for L. D. Hilliard.

Dennis J. Dimsey, W. Bradford Reynolds, Appellate Section, Civil Rights Div., U. S. Dept. of Justice, Washington, D.C., for U. S. A.

David Crump, Law School, University of Houston, Susan E. Waite, The Legal Foundation of America, Houston, Tex., for amicus curiae Legal Foundation of America.

Alvin J. Bronstein, ACLU, Elizabeth Alexander, Washington, D.C., for amicus curiae ACLU—National Prison Project.

Before CLARK, Chief Judge, RUBIN and TATE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

"There is no iron curtain drawn between the Constitution and the prisons of this country."[1] When the remedial powers of a federal court are invoked to protect the constitutional rights of inmates, the court may not take a "hands-off" approach.[2]

■■■ The duty to protect inmates' constitutional rights, however, does not confer the power to manage prisons, for which courts are ill-equipped,[3] or the capacity to second-guess prison administrators.[4] Federal courts should not, "in the name of the Constitution, become . . . enmeshed in the minutiae of prison operations."[5] Our task is limited to enforcing constitutional standards and does not embrace superintending prison administration.[6]

This class action on behalf of more than 33,000 inmates confined in the various institutions operated by the Texas Department of Corrections ("TDC")[7] challenges the conditions of their confinement as cruel and unusual punishment and a denial of due process of law in violation of the eighth and fourteenth amendments to the Constitution.

We are required to determine whether the district court correctly found that the conditions of confinement in TDC violate the Constitution and, if so, whether the remedy imposed went beyond the correction of constitutional deficiencies and intruded unduly on the state's management of its prison system or enmeshed the court in the details of prison management.

We affirm the district court's finding that TDC imposes cruel and unusual punishment on inmates in its custody as a result of the totality of conditions in its prisons. We also affirm the district court's finding that some of TDC's practices deny inmates due process of law. We affirm its conclusion that remedial measures are necessary. Concluding, however, that the district court inappropriately considered state law claims not raised by the parties, we reverse its order that TDC conform its practices to state statutory requirements. We also conclude that some of the remedial measures ordered are not demonstrably required to protect constitutional rights and intrude unduly on matters of state concern and we, therefore, narrow the scope of the relief ordered. An outline of our lengthy opinion is set forth in the margin.[8]

1. *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935, 950 (1974).

2. *See Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 1886, 60 L.Ed.2d 447, 483 (1979); *Procunier v. Martinez,* 416 U.S. 396, 404–07, 94 S.Ct. 1800, 1807–08, 40 L.Ed.2d 224, 235–236 (1974); *Montana v. Commissioners Court,* 659 F.2d 19, 23 (5th Cir. 1981) (per curiam), *cert. denied,* —— U.S. ——, 102 S.Ct. 1730, 72 L.Ed.2d 147 (1982); *Campbell v. Beto,* 460 F.2d 765, 768 (5th Cir. 1972). *See generally* Fox, *The First Amendment Rights of Prisoners,* 63 J.Crim.L., Criminology & Police Sci. 162, 162–64 (1972).

3. *Procunier v. Martinez,* 416 U.S. at 404–05, 94 S.Ct. at 1807, 40 L.Ed.2d at 235.

4. *See Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629, 638 (1977).

5. *Bell v. Wolfish,* 441 U.S. at 562, 99 S.Ct. at 1886, 60 L.Ed.2d at 483.

6. *See id.* at 539, 562, 99 S.Ct. at 1874, 1886, 60 L.Ed.2d at 468, 483; *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263, 267 (1972) (per curiam); *Eisenhardt v. Britton,* 478 F.2d 855 (5th Cir. 1973) (per curiam).

7. Unless otherwise noted, in this opinion "TDC" will also be used to refer to the defendants in this case.

8.
| | TABLE OF CONTENTS | Page |
|---|---|---|
| I. | INTRODUCTORY FACTS | 1127 |
| II. | FAIRNESS OF THE TRIAL | 1129 |
| III. | SUFFICIENCY OF THE FINDINGS | 1132 |
| IV. | INTERVENTION BY THE UNITED STATES | 1134 |
| V. | JOINDER OF THE BOARD OF CORRECTIONS AND ITS INDIVIDUAL MEMBERS | 1136 |
| VI. | EIGHTH AMENDMENT ISSUES | 1137 |
| | 6.1 Cruel and Unusual Punishment: The Constitutional Standard | 1137 |
| | 6.2 Findings by the District Court | 1140 |
| | 6.21 Overcrowding | 1140 |
| | 6.22 Security and Supervision | 1140 |
| | 6.23 Failure to Ameliorate Overcrowding | 1141 |
| | 6.3 Challenges to the Findings | 1141 |

## I. INTRODUCTORY FACTS

The Texas state prison system, operated by TDC, is the largest in the United States. Its inmates, now numbering more than 33,000, are confined in cells or dormitories located in twenty-two separate units, almost all of which have maximum security. Most of the approximately 10,000 cells measure nine feet by five feet, but some are as large as sixty-six square feet. Most of the dormitories house large numbers of inmates and are crowded. After the consolidation of eight separate actions by individual inmates against W. J. Estelle, the Director of TDC, challenging the conditions of their confinement, the district court certified the case as a class action and permitted the United States to intervene as a plaintiff.[9]

The trial began in Houston on October 2, 1978, and, after 159 days of trial, bridging a three-month recess, was completed on September 20, 1979. Three hundred forty-nine witnesses testified and 1,565 exhibits were received into evidence.[10] The district court issued a 118-page memorandum opinion on December 12, 1980, indicating generally the relief it proposed to grant, and gave the parties an opportunity to agree on a proposed judgment. The parties later filed a proposed consent decree disposing of many of the issues.[11] The district court approved this consent decree, entered a decree granting equitable relief and a declaratory judgment [12] on the issues not disposed of by the

| | | |
|---|---|---|
| 6.4 | Relief Ordered by the District Court | 1142 |
| | 6.41 Overcrowding | 1142 |
| | 6.42 New Facilities | 1144 |
| | 6.43 Reorganization of TDC | 1144 |
| | 6.44 Security and safety | 1144 |
| 6.5 | Application of the Constitutional Standard to the Relief Ordered by the District Court | 1144 |
| | 6.51 Overcrowding: Space Requirements | 1146 |
| | 6.52 Other Measures to Relieve Overcrowding | 1148 |
| | 6.53 Staff Training | 1148 |
| | 6.54 Classification of Inmates | 1149 |
| 6.6 | The Constitutional Standard for Medical Care: Huntsville Unit Hospital | 1149 |
| 6.7 | Double-Celling and Exercise for Inmates in Administrative Segregation | 1150 |
| 6.8 | Fire Safety | 1152 |
| VII. | DUE PROCESS ISSUES | 1153 |
| | 7.1 Access to Courts | 1153 |
| | 7.2 Disciplinary Hearings | 1155 |
| VIII. | OTHER CONDITIONS OF CONFINEMENT: THE PENDENT STATE LAW CLAIMS | 1156 |
| IX. | APPOINTMENT OF SPECIAL MASTER | 1159 |
| X. | CONCLUSION | 1163 |
| XI. | SUMMARY | 1163 |
| | 11.1 Uncontested, Settled, and Moot Provisions of the District Court's Decree | 1163 |
| | 11.2 General and Procedural Issues | 1164 |
| | 11.3 Provisions of the District Court's Decree that are Affirmed | 1164 |
| | 11.4 Provisions of the District Court's Decree that are Vacated Without Prejudice | 1164 |
| | 11.5 Provisions of the District Court's Decree that are Vacated | 1165 |
| | 11.6 Appointment of Special Master | 1165 |

| | |
|---|---|
| APPENDIX A | 1165 |
| APPENDIX B | 1168 |
| APPENDIX C | 1172 |

**9.** TDC's motion to dismiss the United States and its request for a writ of mandamus to prevent further participation by the United States in the case were both denied. *In re Estelle*, 516 F.2d 480, 483, 487 (5th Cir. 1975) (*Ruiz I*), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., joined by Burger, C. J., & Powell, J., dissenting). In this appeal TDC challenges the intervention by the United States. Our discussion of this issue is at pp. 1134–1136 *infra*.

**10.** *Ruiz v. Estelle*, 503 F.Supp. 1265, 1276 (S.D. Tex.1980) (hereinafter cited by volume and page number only).

**11.** The parties agreed on provisions concerning (a) health care, except for the continued use of the Huntsville Unit Hospital; (b) the conditions of confinement of mentally retarded and physically handicapped inmates; (c) the conditions of solitary confinement; (d) the rules concerning the use on inmates of chemical agents such as Mace and tear gas; (e) work safety and hygiene in TDC inmate work operations, except for the applicability of Texas state regulatory laws; and (f) procedures for administrative segregation of inmates. This consent decree, which the district court approved on March 3, 1981, is the first of two consent decrees that were approved in this case. It is reproduced as Appendix A to this opinion. In this opinion it is referred to as "the first consent decree."

**12.** The district court entered its original decree on April 20, 1981, and entered an amended version of this decree on May 1, 1981. Unless otherwise noted, in this opinion all references to the district court's decree are to the amend-

consent decree, appointed a special master to monitor implementation of the relief ordered,[13] and denied TDC's motion for a stay. TDC then applied to this court for a stay, which we granted in part and denied in part.[14] TDC later sought a supplemental stay, which, again, we granted in part and denied in part.[15] The parties then agreed to a second consent decree that modified parts of the district court's decree, and we remanded the case to enable the district court to hold a class action hearing on the proposed modifications. After that hearing, the district court approved the second consent decree[16] and, in accordance with its

terms, TDC moved under Fed.R.App.P. 42(b) for voluntary dismissal of its appeal of the provisions of the district court's decree[17] that were superseded by the second consent decree. The case has also been before us on interlocutory appeals; this marks its seventh appearance in our court.[18]

We turn first to the pervasive issues still contested: TDC's attack on the fairness of the trial, the sufficiency of the district court's findings of fact, the intervention by the United States, and the joinder of the Texas Board of Corrections and individual members of the Board as parties defendant.

---

ed version, which is referred to as "the district court's decree" or "the decree," and is cited thus: "Part _____." The amended decree is reproduced in the Appendix to an earlier opinion in this case. *Ruiz v. Estelle*, 666 F.2d 854, 862–73 (5th Cir. 1982) (*Ruiz VI*).

13. The district court entered its order of reference, which appoints the special master and states his powers and responsibilities, on April 20, 1981, the same day on which it entered its original decree granting equitable relief and a declaratory judgment. It entered an amended version of this order on July 24, 1981. Unless otherwise noted, in this opinion all references to the order appointing the special master are to the amended version, which is referred to as "the order of reference" or "the order." The amended order of reference is reproduced as Appendix B to this opinion.

14. *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) (per curiam) (*Ruiz V*).

15. *Ruiz v. Estelle*, 666 F.2d 854 (5th Cir. 1982) (*Ruiz VI*).

16. This consent decree, which the district court approved on June 1, 1982, is a stipulated modification of parts of the district court's decree. Both the stipulated modification and the district court's order approving it are reproduced as Appendix C to this opinion. In this opinion they are referred to collectively as "the second consent decree."

17. Parts II(A) and II(D), which deal with the security staff and the use of inmates in various prison jobs. In this opinion we grant this motion to dismiss. P. 1164 *infra*.

18. The prior proceedings were:
 1. TDC's petition for a writ of mandamus to bar the United States from participating in this action. We denied the petition.

*In re Estelle*, 516 F.2d 480 (5th Cir. 1975) (*Ruiz I*), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., joined by Burger, C. J., & Powell, J., dissenting).
 2. TDC's appeal from parts of a preliminary injunction relating to the appearance of counsel substitute at disciplinary hearings involving the plaintiffs and to provision of adequate food to the plaintiffs to prevent weight loss while they were in solitary confinement. We affirmed, concluding that the plaintiffs had been subjected to "threats, intimidation, coercion, punishment, and discrimination, all in the face of protective orders to the contrary by the district court." *Ruiz v. Estelle*, 550 F.2d 238, 239 (5th Cir. 1977) (per curiam) (*Ruiz II*).
 3. TDC's application for a writ of prohibition preventing the transfer of the final portion of the trial from Houston to Tyler. In an unreported order we granted the application. *Ruiz v. Estelle*, No. ___ (5th Cir. Feb. 16, 1979) (*Ruiz III*). These proceedings resulted in a three-month break in the middle of the trial. *See* 503 F.Supp. at 1276 & n.5.
 4. TDC's appeal from a district court order granting interim attorney's fees. We dismissed the appeal. *Ruiz v. Estelle*, 609 F.2d 118 (5th Cir. 1980) (*Ruiz IV*). TDC has not appealed from this order as part of its appeal from the final judgment.
 5. TDC's application for a stay of portions of the district court's decree, which we granted in part and denied in part. *Ruiz v. Estelle*, 650 F.2d 555 (5th Cir. 1981) (per curiam) (*Ruiz V*).
 6. TDC's second application for a stay of portions of the district court's decree, which we granted in part and denied in part. *Ruiz v. Estelle*, 666 F.2d 854 (5th Cir. 1982) (*Ruiz VI*).

## II. FAIRNESS OF THE TRIAL

TDC contends that the district judge made many errors in his rulings concerning the conduct of the trial and the admissibility of evidence, the cumulative effect of which was so prejudicial as to deny TDC its right to a fair trial. The impugnment is more than a challenge to specific rulings, however, for it includes assertions that "the entire record is permeated with favoritism" toward the plaintiffs and "unrelenting unfairness" toward TDC and is infected both by "evident prejudgment" of the case in the plaintiffs' favor and by judicial bias.

■■■ The constitutional guarantee of due process of law ordains a fair trial.[19] The trial judge must not become "personally embroiled" in the proceedings.[20] He must not assume the role of prosecutor[21] or defender.[22] He must avoid even the appearance of favoring one side.[23] However, "[o]nly when the judge's conduct strays from neutrality is a defendant thereby de-nied a fair trial as required by the Constitution."[24] Moreover, even if the trial judge does commit error, it is presumed harmless until shown to be prejudicial. The complaining party must prove that the error was substantial and that it prejudiced his case.[25]

■■■ Though the trial judge must be neutral, he should not be a passive spectator.[26] "He is a common law judge having that authority historically exercised by judges in the common law process,"[27] and not simply come but to say, "sustained," or "overruled." He may, when in his sound discretion he deems it advisable, comment on the evidence, question witnesses, elicit facts not yet adduced or clarify those previously presented, and maintain the pace of the trial by interrupting or setting time limits on counsel.[28] He must not usurp the role of counsel, but he may manage the trial's course to achieve a "just, speedy, and

**19.** *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955); *Billingsley v. Clayton*, 359 F.2d 13, 15 (5th Cir.) (en banc), *cert. denied*, 385 U.S. 841, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); *Cross v. Georgia*, 581 F.2d 102, 104 (5th Cir. 1978).

**20.** *Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11, 17 (1954).

**21.** *United States v. Jacquillon*, 469 F.2d 380, 387 (5th Cir. 1972), *cert. denied*, 410 U.S. 938, 93 S.Ct. 1400, 35 L.Ed.2d 604 (1973); *Hunter v. United States*, 62 F.2d 217, 220 (5th Cir. 1932).

**22.** *See Carnley v. Cochran*, 369 U.S. 506, 510, 82 S.Ct. 884, 887, 8 L.Ed.2d 70, 74 (1962); *Adler v. United States*, 182 F. 464, 472 (5th Cir. 1910), *quoted in United States v. Lanham*, 416 F.2d 1140, 1144 (5th Cir. 1969).

**23.** *United States v. Brown*, 539 F.2d 467, 469–70 (5th Cir. 1976) (per curiam); *Herman v. United States*, 289 F.2d 362, 365 (5th Cir.), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); *Rapp v. Van Dusen*, 350 F.2d 806, 812 (3d Cir. 1965) (en banc).

**24.** *United States v. Bartlett*, 633 F.2d 1184, 1188 (5th Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 91 (1981); *see Schweiker v. McClure*, ——— U.S. ———, ———, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1, 8 (1982).

**25.** *See Howard v. Gonzales*, 658 F.2d 352, 357 (5th Cir. 1981); *Bell v. Swift & Co.*, 283 F.2d 407, 408 (5th Cir. 1960); *Schwartz v. Eitel*, 132 F.2d 760, 763 (7th Cir. 1943).

**26.** "It is well-established that the conduct of a trial judge must be measured by a standard of fairness and impartiality. He is not a mere moderator, however[.]" *Nordmann v. National Hotel Co.*, 425 F.2d 1103, 1109 (5th Cir. 1970) (footnote omitted); *accord, Patterson v. United States*, 413 F.2d 1001, 1003 (5th Cir. 1969) (per curiam); *In re International Business Machs. Corp.*, 618 F.2d 923, 930 (2d Cir. 1980); *United States v. McCord*, 509 F.2d 334, 347 (D.C.Cir. 1974) (en banc) ("The judge ... is not a passive by-stander in the arena of justice, a spectator at a 'sporting event' ...."), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1656, 44 L.Ed.2d 87 (1975).

**27.** *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979); *accord, Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321, 1324 (1933); *see Herron v. Southern Pac. Co.*, 283 U.S. 91, 95, 51 S.Ct. 383, 384, 75 L.Ed. 857, 860 (1931).

**28.** *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. 1981) (quoting *Moore v. United States*, 598 F.2d at 442); *United States v. Jackson*, 470 F.2d 684, 687 (5th Cir. 1972), *cert. denied*, 412 U.S. 951, 93 S.Ct. 3019, 37 L.Ed.2d 1004 (1973). As we noted in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1293 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974): "A trial judge takes no vow of silence ...."

inexpensive determination" of the action. Fed.R.Civ.P. 1.[29] Obviously he has greater latitude in conducting a bench trial, for then it is his duty to determine the facts, and his conduct cannot influence jurors.[30] In complex and protracted trials like this one, the trial judge must assume even greater responsibility for the direction of the trial than he undertakes in short and simple ones.

Pretrial discovery in this case was exhaustive, the district judge required complete pretrial disclosure of expected testimony, and he limited to some degree the length of cross-examination of a number of witnesses. The trial nevertheless lasted almost a full year. After the plaintiffs had presented all of their witnesses and the United States, as plaintiff-intervenor, had presented most of its witnesses, there was a three-month recess, ample time for TDC to prepare refutation and rebuttal.[31] All of these factors, together with the fact that the judge was the factfinder, must be considered in evaluating TDC's contentions.

The conduct of the district judge is attacked with a barrage of charges. TDC contends that his pretrial orders were more exacting of TDC than of the other parties,[32] and that during pretrial proceedings he was partial to the plaintiffs in many respects. TDC also contends that he excluded much of TDC's evidence,[33] treated TDC's witnesses unfairly in comparison with the treatment accorded the plaintiffs' witnesses,[34]

---

**29.** *See Page v. Barko Hydraulics*, 673 F.2d 134, 140 (5th Cir. 1982) ("The conduct of a fair trial is a matter within the trial judge's discretion."); *Patterson v. United States*, 413 F.2d at 1003 ("[I]t is beyond dispute that a trial judge may take an active role in a trial to guarantee that substantial justice is done."); *Adler v. United States*, 182 F. at 472 ("The trial judge, under the federal system, is not only permitted, but it is his duty, to participate directly in the trial, and to facilitate its orderly progress and clear the path of petty obstructions."), *quoted in United States v. Lanham*, 416 F.2d at 1144.

**30.** *See, e.g., United States v. Nicholson*, 492 F.2d 124 (5th Cir. 1974) (per curiam) (admission of evidence); *Jackson v. United States*, 329 F.2d 893, 894 (D.C.Cir.1964) (per curiam) (interrogation of witnesses); *cf. United States v. Candelaria-Gonzalez*, 547 F.2d 291, 295–97 (5th Cir. 1977) (stressing the effect of trial judge's conduct on jury).

**31.** TDC also sought and obtained a six-month postponement of the initial trial date. 503 F.Supp. at 1276.

**32.** The district court required TDC not only to answer with great specificity the interrogatories put to it by the other parties but also to present pretrial outlines of the testimony TDC expected to elicit from each witness. TDC contends that the burdens imposed on it were "far more onerous than the mere guidelines imposed on the United States." In support of this contention, it does not compare what the district judge exacted of each of these parties, but rather contrasts TDC's "Trial Outline and Supplemental summaries of defense witness testimony" with a compendium of trial outlines furnished by the United States. However, the United States also furnished additional material, permitting TDC to photocopy the United States' witness files, some 30,000 pages.

**33.** To support its contention, TDC points to one instance in which, over the United States' claim of "surprise," the district judge admitted TDC's evidence and said he would give it minimal weight, and also to four times when he excluded TDC's proffered evidence on the ground of surprise. TDC points with suspicion to the district judge's praise of the United States for opening its files to TDC, and to five instances in which the district judge was presumably partial to the United States because he permitted the United States' witness to testify after only fragmentary pretrial disclosure of his expected testimony.

**34.** In the appendix to the briefs, TDC has mustered every episode of what it considers to be the district judge's hostility toward TDC's witnesses and his alleged contemporaneous and unfair solicitude for the plaintiffs' witnesses. It points out that he admonished three-quarters of TDC's witnesses not to disclose their testimony to other witnesses, but similarly admonished less than one-third of the plaintiffs' witnesses. He thrice warned TDC's witnesses of the consequences of perjury or contempt of court. He once prohibited TDC's counsel from reminding adverse witnesses that they were under oath. And the district judge once, before a weekend recess, told an inmate witness to be careful to get his facts straight when the witness returned to the stand because TDC's counsel would try to impeach his testimony on cross-examination.

Some imbalance in the number of witnesses admonished against discussion of their testimony resulted because the district judge gave warnings routinely only after the plaintiffs' sixty-seventh witness, George Wilson, testified that he had violated the rule, invoked at the start of the trial, against witnesses discussing

and improperly limited TDC's cross-examinations and rebuttals.[35] TDC contends generally that the record is "permeated with favoritism."

Considering the full record of the lengthy trial, we find little probative value in the excluded evidence, and no prejudice in the district judge's rulings. TDC has not pointed to a single instance of the exclusion of defense testimony that was not either repetitive or insignificant in probative value. Error cannot be predicated on an evidentiary ruling unless a substantial right of the objecting party is affected. Fed.R. Evid. 103(a).[36] The district judge was required to make literally thousands of decisions on evidentiary issues, usually without advance notice, memoranda from counsel, or opportunity for independent research.[37] In deciding such matters, trial judges are not expected to be either infallible or clairvoyant. The rules of evidence exact only the attainable, the avoidance of error that is prejudicial and affects a substantial right. This standard was fully met.

One time the district judge showed plaintiffs' counsel how to lay a foundation for testimony and four times he relieved a plaintiff-intervenor's counsel how to lay a foundation for testimony and four times he relieved a plaintiff-intervenor's lawyer who was having difficulty laying a predicate by asking the necessary questions himself. Doubtless the floundering lawyer eventually could have satisfied the formalities of each objection. Doubtless the need to conform to proper procedure gave the lawyer good, albeit embarrassing, experience. We see no reason, however, why the district judge should have further protracted the trial by requiring the lawyer eventually to master each difficulty alone, for there was no jury to be affected, and the judge himself could deftly cut what was only a technical knot and expedite the trial.

The district judge did credit the testimony of the plaintiffs' witnesses more frequently than that of TDC's witnesses, but in a bench trial the assessment of witness credibility is inherently his province.[38] We are especially reluctant to set aside findings that are based upon a trial judge's determination of the credibility of witnesses giving contradictory accounts.[39]

their testimony with other witnesses. The district judge promptly struck Wilson's testimony and thereafter began regularly to caution witnesses.

**35.** On a number of occasions the district judge informed TDC's counsel that he considered the TDC's cross-examination of witnesses called by plaintiffs or the United States excessively detailed and lengthy. TDC's brief notes that several times the district judge terminated cross-examination when it lasted longer than he considered appropriate. We note, however, that in each case he did this only after first warning counsel, in some instances repeatedly, that the duration of cross-examination was far exceeding the amount of time taken on direct examination. The cross-examination was protracted. Much time was spent on minor detail. The rebuttal time allowed TDC was virtually unlimited.

**36.** "Absent a showing that substantial rights of the party were adversely affected, reversal for an erroneous ruling on evidence is not warranted. The burden of demonstrating that such substantial rights were affected is on the party who asserts an error ...." *Crumpton v. Confederation Life Ins. Co.*, 672 F.2d 1248, 1253 (5th Cir. 1982) (citations omitted); *accord, Goff v. Continental Oil Co.*, 678 F.2d 593, 596 (5th Cir. 1982) ("The determination of the admissi-

bility of evidence is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion resulting in substantial prejudice to the rights of a party.").

**37.** *Cf. Colonial Refrigerated Transp., Inc. v. Mitchell*, 403 F.2d 541, 551 (5th Cir. 1968) ("[There were] dozens of rulings made by the court in a lengthy and hotly contested trial. It did not then have the benefit of the reasoned objections now made by counsel ....").

**38.** *City of New Orleans v. American Commercial Lines, Inc.*, 662 F.2d 1121, 1123 (5th Cir. 1981); *United States v. Wiring, Inc.*, 646 F.2d 1037, 1041 (5th Cir. 1981); *Blunt v. Marion County School Bd.*, 515 F.2d 951, 958 (5th Cir. 1975); Fed.R.Civ.P. 52(a); *see Pullman-Standard v. Swint*, —— U.S. ——, ——, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66, 77–80 (1982).

**39.** *United States v. Wiring, Inc.*, 646 F.2d at 1041 ("appellate courts should be loathe to set aside such determinations"); *Western Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 590 (5th Cir. 1980); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2586, at 737 & n.15 (1971) (collecting cases). "[T]he burden assumed by the party attempting to show ... mistake is especially strong where the findings

Neither any one episode pointed out in the briefs nor the weight of all of them cumulatively demonstrates that the trial was unfair. At the outset, the trial judge granted TDC's motion for a six-month postponement of the trial date. At TDC's motion, and for TDC's convenience, he changed the venue of the trial. After the plaintiffs and the United States had rested, he gave TDC three months to prepare its defense. He struck the testimony of the plaintiffs' witness who was shown to have violated the nondiscussion rule.[40]

◼ It is beyond either human capacity or the demands of justice that the trial judge decide correctly every issue arising in the trial. What is required is not a perfect score, but fairness, probity, and the avoidance of substantial prejudice.[41]

The first and second consent decrees settled many of the controverted issues, to which much of the trial testimony was devoted. On the matters covered by the consent decrees, their provisions were substantially the same as the remedies outlined by the district judge in his opinion. In addition, TDC does not contest many of the provisions of the district court's decree.[42]

Although this acquiescence is in no sense fatal to TDC's claims, it does indicate that TDC in effect concedes the correctness of many provisions in the district court's judgment.

◼ The district judge's rulings appear to have been based only on what he learned from his seat on the bench and his perception of the evidence. Any adverse attitudes that he evinced were based on his performance of his judicial duties.[43] The remarks of some lawyers during the trial carry notes of testiness and personal involvement that go beyond mere diligent representation of a client's interests, but the district judge never became personally embroiled in the proceedings and he presided over them patiently and fairly. We find neither abuse of discretion nor prejudicial error in his conduct of the trial.[44]

## III. SUFFICIENCY OF THE FINDINGS

Relying upon the first sentence of Fed.R. Civ.P. 52(a), which requires the district court after a bench trial to "find the facts specially and state separately its conclusions of law thereon," TDC contends that the

---

are primarily based upon oral testimony and the trial judge has viewed the demeanor and judged the credibility of the witnesses." *Bryan v. Kershaw*, 366 F.2d 497, 499 (5th Cir. 1966), *cert. denied*, 386 U.S. 959, 87 S.Ct. 1030, 18 L.Ed.2d 108 (1967).

**40.** *See* note 34 *supra*.

**41.** *Dallas Ry. & Terminal Co. v. Sullivan*, 108 F.2d 581, 584 (5th Cir. 1940) ("Dialectical perfection, metaphysical nicety, abstract inerrancy, are not expected or required of Federal trial courts."); *Maryland Cas. Co. v. Reid*, 76 F.2d 30, 33 (5th Cir. 1935) ("Abstract inerrancy is hardly possible in the trial of a case in the federal court; it is never an essential to a valid trial there."); *see Petrites v. J. C. Bradford & Co.*, 646 F.2d 1033, 1036 (5th Cir. 1981) (quoting *King v. Gulf Oil Co.*, 581 F.2d 1184, 1186 (5th Cir. 1978)); *Morris Land & Cattle Co. v. Kilpatrick*, 256 F. 788, 791 (5th Cir. 1919); 28 U.S.C. § 2111. "In any trial of this magnitude and complexity, it is almost inevitable that some error will creep in, despite all efforts to prevent it. A defendant is not entitled to a perfect trial, but only a fair one." *United States v. Evans*, 572 F.2d 455, 491 (5th Cir.),

*cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).

**42.** *See* pp. 1163–1164 *infra*.

**43.** *Cf. In re Grand Jury Proceedings*, 559 F.2d 234, 237 (5th Cir. 1977) (per curiam) ("[T]he alleged bias and prejudice, to be disqualifying, must stem from an extrajudicial source and that prejudice and bias must result in an opinion on the merits on some basis other than what the Judge was exposed to in his participation in th[e] case."), *cert. denied*, 434 U.S. 1062, 98 S.Ct. 1234, 55 L.Ed.2d 762 (1978); *United States v. Serrano*, 607 F.2d 1145, 1150 (5th Cir. 1979) (same), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980).

**44.** *See generally Glasser v. United States*, 315 U.S. 60, 83, 62 S.Ct. 457, 471, 86 L.Ed. 680, 706 (1942) ("The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting.").

district court failed to make findings of fact sufficiently specific for appellate review.[45]

■ The district judge should set forth preliminary and basic facts rather than "[s]tatements conclusory in nature."[46] Ultimate findings must be specifically supported.[47] The opinion in this case, as we have already noted, occupies 118 printed pages. More than half of it is devoted to findings of fact. Some of the factual recitals are specific. In deciding other factual issues, the district judge drew inferences concerning general conditions from specific instances. His findings are not apodictic conclusions of the kind we have found insufficient as a basis for review.[48] They are sufficient to give us a "clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts."[49] However convenient it might be for counsel and the appellate court to have "specific citations to the record," the absence of which TDC criticizes, such citations are not required.

Although the findings are sufficient, they were, as our comments suggest, not all made with the same specificity; indeed, the very nature of some of the issues rendered particularity impossible. The district judge could and did find whether or not a record was made of disciplinary proceedings. He could and did find whether or not on particular occasions one inmate assaulted another. From these data he could and did deduce whether or not it had been shown that inmate assaults were so frequent as to create an atmosphere of violence. That kind of finding, reached by inference from specific data, is both proper and requisite.

■ Whether the data observed are sufficient to warrant a general conclusion must be determined by logic and judgment. The human events of the past cannot be sampled so perfectly as to permit a statistically valid analysis. This kind of conclusion is not a mixed question of fact and law or one of legal inferences from the facts.[50] It is instead one of the sufficiency of an evidentiary basis for a factual conclusion. Although that type of conclusion does not rest on the credibility of witnesses or the advantage of firsthand observation, it is equally a question of fact, to be accepted by us unless clearly erroneous.

■ With regard to both kinds of factual conclusions, we find the district judge's opinion sufficient to give us a clear understanding of the views he took of the evidence, the analytical process by which he reached his conclusions, and the basis by

---

**45.** The rule continues: "If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein."

**46.** *Dalehite v. United States*, 346 U.S. 15, 24 n.8, 73 S.Ct. 956, 962 n.8, 97 L.Ed. 1427, 1434 n.8 (1953).

**47.** *Golf City, Inc. v. Wilson Sporting Goods Co.*, 555 F.2d 426, 433 (5th Cir. 1977); *Humphrey v. Southwestern Portland Cement Co.*, 488 F.2d 691, 694 (5th Cir. 1974); *O'Neill v. United States*, 411 F.2d 139, 146 (3d Cir. 1969).

**48.** *E.g., Ionmar Compania Naviera, S.A. v. Olin Corp.*, 666 F.2d 897, 903 (5th Cir. 1982) ("the district court failed to make any findings of fact or conclusions of law with respect to critical and material issues in the case"); *Curtis v. Commissioner*, 623 F.2d 1047, 1053 (5th Cir. 1980); *Hydrospace-Challenger, Inc. v. Tracor/MAS, Inc.*, 520 F.2d 1030, 1034–35 (5th Cir. 1975); *Victory Towing Co. v. Bordelon*, 219

F.2d 540, 541 (5th Cir. 1955); *cf. Rainey v. Rainey*, 131 F.2d 349, 350 (D.C.Cir.1942) ("No findings were filed by the trial judge ... and the record is so inadequate as to make impossible the determination of several points urged by appellant.").

**49.** *Curtis v. Commissioner*, 623 F.2d at 1051; *accord, Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 515 (5th Cir. 1969) ("The purpose of F.R.Civ.P. 52 is to afford the appellate court a clear understanding of the basis of the trial court's decision."); *Hazeltine Corp. v. General Motors Corp.*, 131 F.2d 34, 37 (3d Cir. 1942) ("[A] reading of the trial judge's opinion reveals a full discussion and treatment of the major factual issues which leaves no doubt as to which facts the court accepted and relied upon in rendering its decision.").

**50.** *See* 9 C. Wright & A. Miller, Federal Practice and Procedure § 2589 (1971).

which he applied legal principles to these facts. No more is required.

## IV. INTERVENTION BY THE UNITED STATES

The district court, acting sua sponte, on April 12, 1974, "determined that the public interest will be served by the participation of the United States" and ordered the United States to appear as amicus curiae and to participate in this case "with the full rights of a party." W. J. Estelle, the Director of TDC, was then the only defendant. After appearing as amicus curiae, the United States moved in December 1974 to intervene as a party plaintiff under Fed.R.Civ.P. 24(b)(2), and also sought leave to file a complaint in intervention adding new causes of action, and adding the Texas Board of Corrections and its individual members as additional defendants. The United States relied upon "the inherent authority of the United States, through its Attorney General, to sue to remedy severe and widespread deprivations of constitutional rights." The motion was granted ex parte and TDC's later motion to dismiss the United States both as plaintiff-intervenor and as amicus curiae was denied.[51]

Whether or not the United States had inherent or implied authority to sue or to intervene in suits to protect the constitutional rights of individual citizens at the time the intervention was filed,[52] Congress has since enacted the Civil Rights of Insti-

tutionalized Persons Act, 42 U.S.C.A. §§ 1997–1997j (West 1981) ("the Act"), which became law on May 23, 1980. The Act authorizes the Attorney General to initiate, id. §§ 1997a–1997b, or intervene in, id. § 1997c, civil actions on behalf of persons confined in specified state institutions, including jails, prisons, and other correctional facilities.

 An appellate court must apply the law in effect at the time it renders its decision unless there is statutory language or legislative history to the contrary, or unless doing so would cause manifest injustice.[53] It must apply that law "even where [the statute] does not explicitly recite that it is to be applied to pending cases."[54] The "law" at issue in this case is the Act, particularly § 1997c, which deals with intervention by the United States.

 That section of the Act comprises two elements: a substantive provision authorizing the Attorney General to intervene in lawsuits, and procedural provisions with which the United States must comply before it may intervene. Nothing in the Act or its legislative history suggests that we should not apply the substantive provision of § 1997c to this case. If anything, the legislative history reinforces the presumption that we should apply it. The Senate Report notes that the Justice Department has intervened in many suits[55] and express-

51. *In re Estelle*, 516 F.2d 480 (5th Cir. 1975) (*Ruiz I*), *cert. denied*, 426 U.S. 925, 96 S.Ct. 2637, 49 L.Ed.2d 380 (1976) (Rehnquist, J., joined by Burger, C. J., & Powell, J., dissenting).

52. *See generally United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979); *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977); *Adams v. Mathis*, 614 F.2d 42 (5th Cir. 1980) (per curiam), *aff'g*, 458 F.Supp. 302 (M.D.Ala.1978); *Halderman v. Pennhurst State School & Hosp.*, 612 F.2d 84, 90–92 (3d Cir. 1979) (en banc), *rev'd on other grounds*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Nuesse v. Camp*, 385 F.2d 694 (D.C.Cir.1967); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 1301–09 (2d ed. 1973 & Supp. 1981); Note,

*Nonstatutory Executive Authority to Bring Suit*, 85 Harv.L.Rev. 1566 (1972).

53. *Bradley v. School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974); *Central Freight Lines, Inc. v. United States*, 669 F.2d 1063, 1069 (5th Cir. 1982) (quoting *Corpus v. Estelle*, 605 F.2d 175, 180 (5th Cir. 1979), *cert. denied*, 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980)); *Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 956 (5th Cir. 1977).

54. *Bradley v. School Bd.*, 416 U.S. at 715, 94 S.Ct. at 2018, 40 L.Ed.2d at 490; *accord, Payne v. Panama Canal Co.*, 607 F.2d 155, 163 (5th Cir. 1979).

55. S.Rep.No.416, 96th Cong., 2d Sess. 1–2, *reprinted in* 1980 U.S.Code Cong. & Ad.News 787, 788–89.

es approval of such intervention.[56] Moreover, the Senate Report,[57] the dissent from the Senate Report,[58] and the House Conference Report [59] all express the view that the United States already had the authority to intervene in such cases, and that the Act merely gave it explicit statutory sanction.[60] We cannot read this legislative history as expressing hostility to pre-Act intervention by the United States. To do so would achieve a result at odds with the understanding of both the supporters and the opponents of the Act.[61] We conclude, therefore, that the *substantive* provision of § 1997c applies in this case.

██ The legislative history of the Act does, however, lead us to conclude that we should not apply the *procedural* provisions of § 1997c in this case. The Senate Report explicitly states that the Act aims to preclude, *inter alia*, the possibility that "suits in which the United States is currently participating as *amicus* or plaintiff-intervenor will be disrupted by defendant[s'] motions to dismiss the United States as a party." [62] Moreover, in discussing other sections of the Act, the legislative history notes other goals of the Act: making Justice Department resources available in lawsuits challenging the conditions of confinement in state institutions,[63] improving the lives of persons confined in state institutions,[64] encouraging state officials to take action to safeguard the rights of these persons,[65] achieving effi-

56. *See id.* at 11–12, 14–16, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 792–94, 795–97. "[I]ntervention has proven an effective means of securing constitutional rights for residents of institutions already the subject of pending litigation . . . ." *Id.* at 15, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 797.

57. *Id.* at 33, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 815 ("This section [§ 1997c] merely codifies the authority which the Attorney General has been exercising since 1971 under rule 24 of the Federal Rules of Civil Procedure.") (footnote omitted).

58. *Id.* at 44, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 825 (minority views of Senators Thurmond, Laxalt, Cochran, and Simpson) ("Under present law, all persons in these institutions can seek judicial relief from unconstitutional conditions in private civil actions, and the Attorney General can intervene to assist.").

59. H.R.Conf.Rep.No. 897, 96th Cong., 2d Sess. 14–15, *reprinted in* 1980 U.S.Code Cong. & Ad. News 832, 839 ("Under [Fed.R.Civ.P. 24], the United States or any other party may in timely fashion apply to a Federal court to intervene as of right or permissively. [42 U.S.C.A. § 1997c] generally codifies the authority which the Attorney General has been exercising since 1971 under this rule.").

60. *Cf. United States v. Rutherford*, 442 U.S. 544, 554 n.10, 99 S.Ct. 2470, 2476 n.10, 61 L.Ed.2d 68, 77 n.10 (1979) ("[O]nce an agency's statutory construction has been 'fully brought to the attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.") (quoting *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 489, 60 S.Ct. 982, 989, 84 L.Ed.

1311, 1320 (1940)); *United States v. Arredondo*, 31 U.S. (6 Pet.) 691, 713, 8 L.Ed. 547, 555 (1832) ("legislative affirmance of the construction put by these tribunals on the laws conferring the authority and prescribing the rules by which it should be exercised").

61. *See First Nat'l Bank v. Walker Bank & Trust Co.*, 385 U.S. 252, 261, 87 S.Ct. 492, 497, 17 L.Ed.2d 343, 349 (1966) ("It is not for us to so construe the [Act] as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at the time of its adoption.").

62. S.Rep.No. 416 at 17, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 798. The Senate Report expressed the fear that such motions to dismiss would proliferate after the decisions in *United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979), and *United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977). These cases held that the United States, without specific statutory authorization, cannot sue to redress alleged deprivations of constitutional rights of individuals confined in state institutions.

63. *See* S.Rep.No. 416 at 2, 20, 27, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 789, 801–02, 809; H.Conf.Rep.No. 897, at 9, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 833.

64. *See* S.Rep.No. 416 at 2, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 789; H.Conf. Rep.No. 897 at 9, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 833.

65. *See* S.Rep.No. 416 at 2, 14, 17 & n.49, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 789, 795, 799 & n.49; H.Conf.Rep.No. 897 at 9, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 833.

cient use of Justice Department resources,[66] and ensuring "conservation of judicial resources." [67] To dismiss the United States at this state in the litigation,[68] when it could simply initiate a new lawsuit,[69] and thereby duplicate its previous, massive efforts, would do violence to all of these goals. We decline to "cause great disruption by forcing the parties ... to begin anew a case that all parties agree could eventually be decided under the new law. Congress did not intend the enactment of the new law to cause such tribulation." [70]

■ Furthermore, considering the identity of the parties in this case, the nature of their rights, and the impact of the change in law upon those rights,[71] we find that no

66. *See* S.Rep.No. 416 at 16 ("the most efficient and effective use of the Justice Department's resources"), 18 ("utilize the resources of the Justice Department in the most effective manner possible"), *reprinted in* 1980 U.S.Code Cong. & Ad.News at 797, 799.

67. *Id.* at 23, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 805; *accord, id.* at 24 ("guaranteeing the most effective use of limited judicial resources"), 28 ("guarantee[ing] that the litigation will be handled ... with a minimal expenditure of judicial time and resources"), *reprinted in* 1980 U.S.Code Cong. & Ad.News at 805, 810; *see id.* at 29 n.81 (quoting *Kimbrough v. O'Neil*, 523 F.2d 1057, 1066 (7th Cir. 1975) (Stevens, J., concurring), *rev'd en banc*, 545 F.2d 1059 (7th Cir. 1976)), 34, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 812 n.81, 816; H.Conf.Rep.No.897 at 9, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 834.

68. In *United States v. Elrod*, 627 F.2d 813 (7th Cir. 1980), the court applied the procedural requirements of § 1997a to a lawsuit that was initiated by the United States and was pending on appeal when the Act was passed. *Id.* at 819. In *Elrod*, however, "[t]here ha[d] been no trial on the merits or other evidentiary hearing." *Id.* at 815; *cf. Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d 1174, 1180 n.6 (2d Cir. 1977) (retroactive application of regulation) ("We see no unfairness in applying the new regulation at this early stage of the litigation, when no substantial costs have yet been incurred, and no important interlocutory rulings have been made ....").

69. 42 U.S.C.A. § 1997a.

70. *Central Freight Lines, Inc. v. United States*, 669 F.2d at 1069–70 (footnote omitted) (discussing Motor Carrier Act of 1980, Pub.L.No.

"manifest injustice" results from our application of the Act to this case.[72]

■ For these reasons, we affirm the district court's order permitting intervention.

## V. JOINDER OF THE BOARD OF CORRECTIONS AND ITS INDIVIDUAL MEMBERS

In the original suits filed by individual inmates, only W. J. Estelle, the Director of TDC, was named as defendant. In its complaint in intervention, however, the United States also named as defendants the Texas Board of Corrections and its individual members. Texas law charges the Board of Corrections "with the exclusive management and control of" TDC.[73]

96–296, 94 Stat. 793 (codified in scattered sections of 49 U.S.C.)); *cf. Ralpho v. Bell*, 569 F.2d 607, 616 n.51 (D.C.Cir.) ("We think it entirely reasonable to suppose that in the instance of the suit that clearly can be reinstated, Congress felt it the part of common sense not to require the inconvenience of refiling.... [T]o insist [otherwise] would frustrate the purpose and policy underlying the new legislation ... by calling upon the courts to do the same work twice."), *rehearing denied per curiam*, 569 F.2d 636 (D.C.Cir.1977); *In re District of Columbia Workmen's Compensation Act*, 554 F.2d 1075, 1080 (D.C.Cir.) ("To require [the plaintiff] now to abandon his three-year quest for judicial relief, and to reenter the administrative process simply because a new administrative review step has been inaugurated, would obviously involve a great waste of time, energy and money. Surely if Congress had thought that such a price was warranted, it expectably would have said so unequivocally."), *cert. denied*, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976).

71. *Bradley v. School Bd.*, 416 U.S. at 717, 94 S.Ct. at 2019, 40 L.Ed.2d at 491; *Central Freight Lines, Inc. v. United States*, 669 F.2d at 1069.

72. Indeed, such injustice probably would result if we ignored the Act's legislative history and, as TDC urges on us as an alternative argument on this issue, proceeded to apply the procedural provisions of the Act to this case. *See Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d at 1180 n.6.

73. Tex.Rev.Civ.Stat.Ann. art. 6166g (Vernon 1970).

This action was initiated under 42 U.S.C. § 1983, which provides that "[e]very person" who, under color of law, subjects a citizen to deprivation of his federal rights shall be liable to that citizen.[74] The states' eleventh amendment sovereign immunity bars an action in federal court against a state or a state agency unless the state has consented to suit.[75] Congress, in enacting § 1983, did not intend "to override the traditional sovereign immunity of the states."[76] Thus neither states nor state agencies are "persons" within the meaning of § 1983.[77]

The Board of Corrections is merely an agency of the state. It is, therefore, neither a "person" nor, consequently, a proper party defendant. As the United States now concedes, the district court's judgment must be reversed insofar as it casts the Board as a defendant, and the Board, as an entity, must be dismissed from this case.[78]

The individual members of the Board, however, are of course persons. Although the Texas statute vests management of the prison system in the Board, the Board members are responsible as individuals, in the same manner as the Director of TDC, for any violation of constitutional rights caused by their management.[79]

TDC contends that the Board members are superfluous defendants because the Director of TDC is also a defendant and can respond to any court orders. The mere fact that one defendant can pay a judgment or effectuate a court order has never been deemed reason to dismiss other persons who are legally responsible to the plaintiff, and TDC cites no authority for the proposition that one amenable defendant suffices. Accordingly, the joinder of the individual members of the Board was proper.

## VI. EIGHTH AMENDMENT ISSUES

### 6.1 Cruel and Unusual Punishment: The Constitutional Standard

Before reviewing the findings of fact relative to the charge of cruel and unusual punishment, we set out the legal precepts that we must follow. In *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), which was decided after the district court had rendered its opinion and its orders in this case,[80] the Supreme

---

**74.** 42 U.S.C. § 1983 (Supp. III 1979) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**75.** *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114, 1116 (1978) (per curiam); *Sessions v. Rusk State Hosp.*, 648 F.2d 1066, 1069 (5th Cir. 1981). "Absent a state's consent, the eleventh amendment bars a civil rights suit in federal court that names the state as a defendant, even a claim seeking injunctive relief .... The eleventh amendment's bar extends to suits against departments or agencies of the state having no existence apart from the state." *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981). None of the parties

has suggested that the State of Texas has consented to suit.

**76.** *Quern v. Jordan*, 440 U.S. 332, 341, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358, 366 (1979).

**77.** *E.g., Laje v. R. E. Thomason Gen. Hosp.*, 665 F.2d 724, 727 n.2 (5th Cir. 1982) ("States are considered non-persons for Section 1983 purposes."); *Holladay v. Montana*, 506 F.Supp. 1317, 1321 (D.Mont.1981).

**78.** *Accord, Gross v. Tazewell County Jail*, 533 F.Supp. 413, 418 (W.D.Va.1982); *Bennett v. Reed*, 534 F.Supp. 83, 85 (E.D.N.C.1981), *aff'd mem.*, 676 F.2d 690 (4th Cir. 1982).

**79.** *Gay Student Servs. v. Texas A & M Univ.*, 612 F.2d 160, 164, 165 (5th Cir.), *cert. denied*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); *see Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 56 L.Ed.2d 1114 (1978) (per curiam); *Sessions v. Rusk State Hosp.*, 648 F.2d at 1069; *Spicer v. Hilton*, 618 F.2d 232, 236–37 (3d Cir. 1980).

**80.** The district court entered its original decree granting equitable relief and a declaratory judg-

Court considered for the first time the limitation that the eighth amendment, which is applicable to the states through the fourteenth amendment,[81] "imposes upon the conditions in which a State may confine those convicted of crimes."[82] After reviewing "the Eighth Amendment precedents for the general principles that are relevant to a State's authority to impose punishment for criminal conduct," the Court noted that the amendment "prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.' "[83] Thus the eighth amendment prohibits inflictions of pain that are " 'totally without penological justification.' "[84]

"No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' "[85] These " 'judgments should not be, or appear to be, merely the subjective views of individual [judges].' "[86] The judgments instead " 'should be informed by objective factors to the maximum possible extent.' "[87]

The same "principles apply when the conditions of confinement compose the punishment at issue."[88] "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."[89]

Applying these precepts, the *Rhodes* Court held that confining two inmates to one cell, called double-celling, at an Ohio maximum security prison was not cruel and unusual punishment. Double-celling was made necessary by an unanticipated increase in prison population. It did not lead to deprivations of essential food, medical care, or sanitation. It did not "increase violence among inmates or create other conditions intolerable for prison confinement."[90] It diminished job and educational opportunities only "marginally."[91]

The Court had previously noted other facts. The cells measured sixty-three square feet. Each had a cabinet-type night stand and other furnishings. Double-celling had not reduced significantly the availability of space in the day rooms or visitation rooms, nor had it rendered the library or school facilities inadequate. There had

ment on April 20, 1981, and entered an amended version of this decree on May 1, 1981. It entered its order of reference, appointing the special master and outlining his powers and responsibilities, on April 20, 1981, and entered an amended version of the order of reference on July 24, 1981. *Rhodes* was decided on June 15, 1981.

81. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Williams v. Treen*, 671 F.2d 892, 900 n.16 (5th Cir. 1982).

82. 452 U.S. at 343–345, 101 S.Ct. at 2397–98, 69 L.Ed.2d at 66–67.

83. *Id.* at 345, 101 S.Ct. at 2398, 69 L.Ed.2d at 67 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859, 874 (1976) (joint opinion)).

84. *Id.* (quoting *Gregg v. Georgia*, 428 U.S. at 183, 96 S.Ct. at 2929, 49 L.Ed.2d at 880).

85. *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (1958) (plurality opinion)).

86. *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382, 391 (1980) (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982, 989 (1977) (plurality opinion)), *quoted in Rhodes v. Chapman*, 452 U.S. at 345, 101 S.Ct. at 2398, 69 L.Ed.2d at 67.

87. *Rummel v. Estelle*, 445 U.S. at 275, 100 S.Ct. at 1139, 63 L.Ed.2d at 391 (quoting *Coker v. Georgia*, 433 U.S. at 592, 97 S.Ct. at 2866, 53 L.Ed.2d at 989), *quoted in Rhodes v. Chapman*, 452 U.S. at 345, 101 S.Ct. at 2398–99, 69 L.Ed.2d at 67.

88. *Rhodes v. Chapman*, 452 U.S. at 346, 101 S.Ct. at 2399, 69 L.Ed.2d at 69.

89. *Id.*

90. *Id.*

91. *Id.*

been no increase in the rate of violence.[92] The ratio of guards to inmates "satisfied the standard of acceptability" offered by the inmates' expert witness.[93]

██ This review of the opinion makes it evident that *Rhodes v. Chapman* does not reject the "totality of conditions" test that we applied in *Jones v. Diamond*, 636 F.2d 1364, 1368 (5th Cir. 1981) (en banc).[94] Like Justice Brennan in his concurring opinion,[95] we read the majority opinion in *Rhodes v. Chapman* as adopting that test, just as another panel of this court recently did in *Stewart v. Winter*, 669 F.2d 328, 335–36 & n.17 (5th Cir. 1982).[96] This interpretation is

based not only on the opinion's precise and carefully chosen words but on its factual recitals. Were it necessary to decide only that confining two inmates in a single cell is not cruel and unusual punishment, there would have been no need to describe the general conditions in the prison. *Rhodes* holds that the confinement of two persons in one cell is not per se cruel and unusual when, all prison conditions having been considered "alone or in combination," inmates are not deprived of the "minimal civilized measure of life's necessities."[97] This is also the reading that other courts have given to *Rhodes*.[98] *Rhodes* does, however, hold that

---

**92.** The district court "found that the number of acts of violence at [the prison] had increased with the prison population, but only in proportion to the increase in population." *Id.* at 341, 101 S.Ct. at 2396, 69 L.Ed.2d at 65.

**93.** *Id.* at 341–343, 101 S.Ct. at 2396–97, 69 L.Ed.2d at 65–66.

**94.** The Supreme Court granted certiorari in *Jones v. Diamond*, 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970 (1981), then limited the grant of certiorari to the issue of the court's award of expert witness fees and expenses, 453 U.S. 911, 101 S.Ct. 3141, 69 L.Ed.2d 993 (1981); *see* Petition for Writ of Certiorari at 12–14, *Ledbetter v. Jones* (U.S. Apr. 28, 1981) (No. 80–1804). The parties settled this issue by consent decree. *Jones v. Diamond*, No. 73S–180(C) (S.D.Miss. Dec. 11, 1981). The Supreme Court then dismissed the writ of certiorari under Sup.Ct.R. 53. 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981).

**95.** 452 U.S. at 363 n.10, 101 S.Ct. at 2407 n.10, 69 L.Ed.2d at 79 n.10 ("The Court today adopts the totality of the circumstances test.").

**96.** The *Stewart* panel referred to *Rhodes* and the "totality of the circumstances" test while discussing whether a district judge had properly denied class certification in a lawsuit challenging conditions of confinement in several county jails. That panel did not actually apply the test, as we now do.

**97.** 452 U.S. at 346, 101 S.Ct. at 2399, 69 L.Ed.2d at 69.

**98.** *Madyun v. Thompson*, 657 F.2d 868, 874 (7th Cir. 1981) ("We are aware that the essence of an Eighth Amendment violation consists of the totality of the conditions of confinement."); *Villanueva v. George*, 659 F.2d 851, 854 (8th Cir. 1981) (en banc) (pretrial detainee) ("our decision . . . is . . . based upon the totality of the circumstances"); *Bono v. Saxbe*, 527

F.Supp. 1187, 1195 (S.D.Ill.1981); *Heitman v. Gabriel*, 524 F.Supp. 622, 625 (W.D.Mo.1981); *see Maxwell v. Mason*, 668 F.2d 361, 363–65 (8th Cir. 1981) (by implication) (punitive confinement of inmate); *Nelson v. Collins*, 659 F.2d 420, 427–29 (4th Cir. 1981) (en banc); *id.* at 430 (Winter, C. J., concurring and dissenting); *Smith v. Fairman*, 528 F.Supp. 186 (C.D. Ill.1981).

TDC argues that the Ninth Circuit, in *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982), read *Rhodes* as rejecting "the totality" test. The *Hoptowit* court said:

> In assessing claims of Eighth Amendment violations, and equally importantly, in tailoring a proper remedy, we must analyze each claimed violation in light of these requirements [*i.e.*, "discrete areas of basic human needs"]. Courts may not find Eighth Amendment violations based on the "totality of conditions" at a prison.

*Id.* at 1246.

However, the court later observed:

> As we have said, however, "[E]ach condition of confinement does not exist in isolation; the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions." [*Wright v. Rushen*, 642 F.2d 1129, 1133 (9th Cir. 1981)]. This is no more than a recognition that a particular violation may be the result of several contributing factors. "But the court's principal focus must be on specific conditions of confinement. It may not use the totality of all conditions to justify federal intervention requiring remedies more extensive than are required to correct Eighth Amendment violations." [*Wright v. Rushen*, 642 F.2d at 1133.] To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements. We cannot rely on a vague conclusion that the "totality of conditions" violates the Eighth Amendment.

the totality of the conditions of confinement does not offend the Constitution unless prison conditions are cruel and unusual, and not merely harsh or restrictive.

These precepts provide the illumination by which we examine those provisions of the district court's decree based on the eighth amendment.

### 6.2 Findings by the District Court

#### 6.21 Overcrowding

At the time of trial, TDC confined over 26,000 inmates. (The inmate population has since increased to over 33,000.) About 1,000 were sleeping on floors. (None are now on floors but many are confined in tents.) In cells measuring forty-five square feet,[99] originally designed for one occupant, TDC confined two to four inmates. The district court found that assault or molestation by fellow inmates was a continual threat. It found that the population density of inmates confined in dormitories was "shocking."[100]

This overcrowding "exercises a malignant effect on all aspects of inmate life."[101] Day rooms designed for recreational purposes must serve double and even triple the number of inmates for which they were planned. Access to gymnasiums, outdoor playing fields, craft shops, and libraries is even more limited. Dining rooms are nearly always crowded.[102]

Although TDC contends that, because of TDC's "work ethic," inmates spend little of their time in cells or dormitory sleeping areas, in fact inmates spend much of their time in their living quarters. Because of a shortage of civilian guards who can be assigned to supervise inmates working in agricultural programs, the full complement of inmates assigned to work on TDC's farms cannot safely be employed on any given day. "Therefore, at many units, the inmates work on a rotating basis. As many as one-half to three-fourths of the inmate agricultural force will remain idle in the living quarters on a specific day."[103] In view of the "unprecedented surge" in prison population, new facilities being constructed will not eliminate the overcrowding.[104] The district judge emphasized the threat to the inmates' safety, the lack of privacy for inmates, the increase in stress and tension, and the possible spread of disease, all caused by overcrowding.[105]

#### 6.22 Security and Supervision

TDC's prisons are severely understaffed. During the summer of 1979, TDC employed one guard for every 12.45 inmates, one of the worst guard-inmate ratios in the nation;[106] the average nationally is one guard

---

Id. at 1247.

*Hoptowit* thus seems to us to say that conditions of confinement that in some circumstances would not be cruel and unusual may in other circumstances, when combined with other conditions, rise to that level. We agree with the *Hoptowit* court's conclusion that a generalized and "vague conclusion" concerning the totality of conditions is insufficient.

TDC also argues that, "[i]n light of *Rhodes*, the Ninth Circuit reiterated its condemnation of the 'totality of conditions' approach in *Wright v. Rushen*, 642 F.2d 1129, 1132 (9th Cir. 1981)." But *Wright* was decided more than three months before *Rhodes*, so *Wright* could hardly be read as following or interpreting *Rhodes*.

**99.** A few cells are slightly larger or smaller than 45 square feet. 503 F.Supp. at 1277 n.7.

**100.** *Id.* at 1278.

**101.** *Id.* at 1277; *accord, e.g., Worthington v. Fauver*, 88 N.J. 183, 188–189, 440 A.2d 1128, 1130 (1982):

It is commonly acknowledged that overcrowding in prisons causes grave problems. Rehabilitative programs and recreation become disrupted or nonexistent. As crowding increases, frustration and anger emerge, causing tempers to flare and fights to erupt. Lack of space makes it difficult if not impossible to segregate prisoners for disciplinary and other purposes. Overcrowding can contribute to riots.

**102.** 503 F.Supp. at 1280.

**103.** *Id.* at 1279 n.11.

**104.** *Id.* at 1280–81.

**105.** *Id.* at 1281–83.

**106.** With the help of additional legislative appropriations, by the time this appeal was heard, there was one guard for every 10.4 inmates. *Ruiz VI*, 666 F.2d at 860.

for every five inmates.[107] TDC's argument that its system requires fewer guards than others was rejected by the district court after a detailed analysis of staffing patterns.[108]

Overcrowding, combined with the relatively small number of security guards, results in a "constant threat to the inmates' personal safety."[109] Escapes are virtually unheard of and homicides are uncommon, but there is excessive nonhomicidal violence. "[V]irtually all inmates are exposed to, and many are victimized by, the concomitants of unguarded, overcrowded cells and dormitories—the ever-present risk of assaults, rapes and other violence—for every day of their incarceration at TDC."[110] "TDC inmates are routinely subjected to brutality, extortion, and rape" by their cellmates.[111] "Inmates who live in dormitories are exposed to the same threats of violence endemic to the cells."[112] The threat to inmates in dormitories may be even greater because "[p]otentially assaultive inmates are present in great numbers in every dormitory" and the dormitories are "practically unsupervised."[113] "Numerous examples of the inability of TDC staff to protect inmates' personal safety were graphically presented by credible testimony at the trial."[114]

These conditions result from having too few civilian guards to supervise inmate activities adequately, from inadequate training for new guards, and from a high turnover rate that "results in virtually perpetual vacancies in low-level guard positions."[115]

### 6.23 Failure To Ameliorate Overcrowding

TDC officials have the power, the district judge found, to reduce TDC's inmate population quickly by increasing "good time" credit, and restoring forfeited good time.[116] Inmates receive incentive ("PIP") points for good performance in work, education, and personal improvement programs. The Board of Pardons and Paroles declines to interview any inmate who has less than a specified number of PIP points, who has suffered a forfeiture of good time that has not been restored, or who is in Class III status. By awarding more PIP points, restoring lost good time, classifying more inmates in Class I status, and preparing favorable "institutional adjustment" reports, TDC officials could increase the number of inmates likely to receive parole.[117] Moreover, TDC has failed to implement in more than a "half-hearted and unimaginative"[118] fashion the work release program authorized by Texas law.[119]

### 6.3 Challenges to the Findings

The web of conditions is not seamless. The findings of fact concerning various conditions at TDC are discrete. Moreover, the

---

107. 503 F.Supp. at 1290.

108. *Id.* at 1291–92.

109. *Id.* at 1281.

110. *Id.* at 1280.

111. *Id.* at 1281.

112. *Id.* at 1282.

113. *Id.*

114. *Id.* at 1293 (citing examples).

115. *Id.* at 1288.

116. Under Texas good time laws, inmates who exhibit good behavior while serving their sentences may accelerate completion of their period of confinement. It is TDC policy for prisoners entering prison to be automatically assigned to Class I, in which status they earn twenty extra days for every thirty days served. At the discretion of TDC officials, an inmate may be: (1) promoted to a trusty status, in which he earns thirty days for every thirty days served; (2) demoted to Class II, in which he earns ten days for each thirty served; or (3) demoted to Class III, in which no good time is earned. Earned good time may also be forfeited as a disciplinary measure, the unit wardens having the discretion to restore the good time after a period of good conduct has been served. *Id.* at 1283 n.23.

117. *Id.* at 1284.

118. *Id.*

119. Tex.Rev.Civ.Stat.Ann. art. 6166x–3 (Vernon 1970 & Cum.Supp.1982).

injunctive relief ordered by the district court includes provisions patently and properly directed at specific conditions. We now consider TDC's challenges to those findings that determine the totality of conditions caused by overcrowding in the presence of the other conditions discussed, particularly the size of the security staff.

The district judge's conclusion that TDC's prisons are seriously overcrowded is virtually conceded. TDC questions only whether this overcrowding constitutes cruel and unusual punishment, whether the remedies ordered are appropriate, and whether specific provisions of the decree are "ill-considered and unwise." TDC challenges the findings concerning the inadequacy of prison security and the existence of staff brutality as being clearly erroneous.

■ The district judge's findings concerning the specific episodes mentioned in his opinion turn entirely on the credibility of witnesses. On this, as on virtually every other aspect of the case, there was conflicting testimony. There was substantial evidence on the record to support the district judge's findings, and we have been given no reason to overturn them, save the inadequate reason that the testimony of others conflicts. We do not sit to reassess that testimony. This is neither our function as appellate judges nor within our power.[120]

Based on these specific findings, the district judge made other, more general factual findings. He found that the life of the typical inmate within TDC is characterized by a constant threat of violence and that TDC staff members engage in "widespread" brutality to inmates. These find-

ings necessarily are partly conclusory; their accuracy depends on inferences from the specific facts established.

■ Considering that TDC houses more than 33,000 inmates, it is proper to ask the question that this court put to counsel before oral argument: how many episodes of inmate assault must be shown to warrant the conclusion that there is a constant threat of violence? Patently the trial should not and cannot consist of a review either of every assault over a five-year period or of a day in the life of each of the inmates. The statistics presented are inconclusive. The homicide rate at TDC is less than in many cities. The assault rate is less than the rate reported in other prison cases,[121] but this means only that other prisons are worse. The guard-inmate ratio is among the lowest in the nation. Considering the record as a whole, we are not left with that impression requisite to rejecting the district judge's findings, "the definite and firm conviction" that he was mistaken.[122]

### 6.4 Relief Ordered by the District Court

This relief is set forth in full in the Appendix to our opinion in *Ruiz VI*, 666 F.2d at 862–73, and summarized in *Ruiz V*, 650 F.2d at 559–64. However, we here again outline its principal features, as they relate to overcrowding[123] and security.

### 6.41 Overcrowding

a. Maximum Population: Effective November 1, 1981.

By November 1, 1981, TDC had to reduce its overall inmate population to a figure

---

**120.** *Olgin v. Darnell*, 664 F.2d 107, 108 (5th Cir. 1981) ("A court of appeals has neither permission nor prerogative to reappraise the credibility of witnesses."); *see Pullman-Standard v. Swint*, —— U.S. at ——, 102 S.Ct. at 1788–91, 72 L.Ed.2d at 77; *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968, 976 (5th Cir. 1978); *Colvin v. Kokusai Kisen Kabushiki Kaisha*, 72 F.2d 44, 46–47 (5th Cir. 1934); Fed. R.Civ.P. 52(a).

**121.** For example, in 1980, 752 assaults were reported at TDC. The inmate population was 28,000. The assault rate, therefore, was 2.7%, while in *Miller v. Carson*, 401 F.Supp. 835, 873,

883 (M.D.Fla.1975), *aff'd and modified*, 563 F.2d 741, 745 (5th Cir. 1977), it was about 27%, or 10 times the rate at TDC.

**122.** *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765 (1948); *accord, e.g., O'Toole v. New York Life Ins. Co.*, 671 F.2d 913, 914 (5th Cir. 1982).

**123.** We need not discuss those provisions of the district court's decree that are not at issue in this appeal. *See* pp. 1163–1164 *infra*.

equal to twice the number of general population cells, plus the number of inmates who could be housed in dormitories that afford forty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed that figure.[124]

b. Maximum Population: Effective November 1, 1982.

By November 1, 1982, TDC must reduce its overall inmate population to a figure equal to 1.5 times the number of general population cells, plus the number of inmates who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed that figure.[125]

c. Maximum Population: Effective November 1, 1983.

By November 1, 1983, TDC must reduce its overall inmate population to a number equal to the number of general population cells, plus the number of inmates who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed that figure.[126]

d. Double-Celling.

By August 1, 1982, no more than 50% of TDC's inmate population housed in cells may be assigned to cells of sixty square feet or less holding two inmates. By August 1,

1983, no inmate may be assigned with another inmate to a cell containing sixty square feet or less.[127]

e. Dormitories.

Beginning November 1, 1981, TDC could not confine any inmate to a dormitory providing less than forty square feet (excluding bathing, toilet, and activity areas) per inmate. By November 1, 1982, TDC may not confine any inmate to a dormitory providing less than sixty square feet (excluding bathing, toilet, and activity areas) per inmate.[128]

f. Work Furlough.

To alleviate overcrowding, TDC is required to make maximum use of its authority to house inmates outside of TDC units on the work furlough program as authorized by Tex.Rev.Civ.Stat.Ann. art. 6166x–3 (Vernon 1970 & Cum.Supp.1982). By November 1, 1981, TDC was to have at least 300 inmates on work furlough; by May 1, 1982, TDC was to have at least 1,200 inmates on work furlough; and by November 1, 1982, and thereafter until further order of the court, TDC must at all times have at least 2,500 inmates on work furlough.[129]

g. Temporary Furlough.

TDC must expand its temporary inmate furlough program as authorized by Tex. Rev.Civ.Stat.Ann. art. 6184n(2) (Vernon Cum.Supp.1982). By November 1, 1981, TDC was to have at least 300 inmates on this furlough program; by May 1, 1982, TDC was to have at least 600 inmates on furlough; and by November 1, 1982, and thereafter until further order of the court,

---

**124.** Part I(B)(2).

**125.** Part I(B)(3).

**126.** Part I(B)(4). The portion of the decree that sets the maximum inmate population figures also contains a reporting requirement. Part I(B)(1).

**127.** Part I(E). In effect, even though the district court's decree authorizes double-celling of

inmates in cells of 60 square feet or more after August 1, 1983, Part I(B)(4) of the decree requires single-celling of inmates at TDC after November 1, 1983.

**128.** Parts I(B)(2)–(4), I(F).

**129.** Parts I(A)(1)(c), I(A)(4).

TDC must at all times have at least 1,000 inmates on furlough.[130]

h. Expanding Community Corrections.

TDC must expand its role in community corrections and establish minimum security institutions, honor farms, halfway houses, urban work or educational release centers, community treatment centers, and the like. These facilities must be located in areas near population centers of sufficient size to provide the services needed by inmates at the facilities. By November 1, 1981, TDC was to have filed with the court a plan for the establishment of such facilities with or without the participation of other state or local agencies.[131]

6.42 New Facilities

a. Construction of New Units.

TDC must not make a final selection of a site for, or undertake the construction of, any new units for housing inmates unless it has filed a report with the court demonstrating that specified conditions are met. These conditions require, *inter alia*, that the population of each new TDC unit or sub-unit [132] not exceed 500 inmates, and each new TDC unit must be located within fifty miles of a Standard Metropolitan Statistical Area with a population exceeding 200,000 people.[133]

b. New Facilities at Existing Units.

TDC is prohibited from undertaking construction of any new facilities for the housing of inmates at existing correctional units unless it has filed a report with the court demonstrating, *inter alia*, that the space requirements in Part I of the decree will be met, and that it will be able to recruit and maintain adequate numbers of the employees needed to run the facilities.[134]

6.43 Reorganization of TDC

TDC must submit a plan providing for the reorganization and decentralization of the management of each TDC unit housing more than 500 inmates, and ensuring that the affected units will be subdivided into units of no more than 500 inmates each.[135]

6.44 Security and Safety

a. Staff Training.

By August 1, 1981, TDC was required to file with the court a plan and timetable for the training of new security officers and the retraining of existing security officers.[136]

b. Classification of Inmates.

So long as TDC confines more than one inmate to a cell of sixty square feet or less, or to a dormitory, TDC must maintain a classification system that ensures that abuses of inmates by those with whom they live will be minimized. TDC was required, by August 1, 1981, to file with the court a plan setting forth an adequate classification system and a timetable for its implementation.[137]

6.5 *Application of the Constitutional Standard to the Relief Ordered by the District Court*

Although a district court has wide discretion in tailoring a remedial injunction,[138] that discretion is not uncon-

---

**130.** Parts I(A)(1)(d), I(A)(5).

**131.** Part I(A)(6).

**132.** The conditions also apply to two units that were proposed or under construction when the district court issued its decree. Part VII(B).

**133.** Part VII(A).

**134.** Part VII(C).

**135.** Part VIII.

**136.** Part II(B).

**137.** Part II(E).

**138.** *Milliken v. Bradley*, 433 U.S. 267, 281, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745, 756 (1977) (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 566 (1971)), *quoted in Hutto v. Finney*, 437 U.S. 678, 687 n.9, 98 S.Ct. 2565, 2572 n.9, 57 L.Ed.2d 522, 532 n.9 (1978); *Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977); *Ramos v. Lamm*, 639 F.2d 559, 586

fined. As we have pointed out, the constitutional mandate against cruel and unusual punishment is not a warranty of pleasant prison conditions. Reparative injunctive relief must be targeted at elimination of the unconstitutional conditions. "[T]he nature of the violation determines the scope of the remedy." [139] Therefore, a court can order only relief sufficient to correct the violation found.[140] We have neither commission nor competence to prescribe the purposes of confinement.

As a matter of respect for the state's role and for the allocation of functions in our federal system, as well as comity toward the state, the relief ordered by federal courts must be "consistent with the policy of minimum intrusion into the affairs of state prison administration that the Supreme Court has articulated for the federal courts." *Ruiz V*, 650 F.2d at 571.[141] "[T]he principles of federalism which play such an important part in governing the relationship between federal courts and state governments" are applicable "where injunctive relief is sought ... against those in charge of an executive branch of an agency of state" government.[142] We should, therefore, fashion "the least intrusive remedy that will still be effective." [143] In shaping that remedy, we must also, as a matter of judicial administration, regard the essential nature of federal courts in an adversary system. Our remedial powers are inherently judicial, not administrative.[144]

The experienced district judge gave lengthy and careful attention both to the trial of this case and to the fashioning of the reparative injunction. In many respects the decree he shaped is focused directly on steps to remedy the aspects of confinement that together make it cruel and unusual. In other respects the decree is, as the district court's order of reference to the special master recites, "infinitely broader than that encountered in any other example of correctional litigation." Considering both the constitutional violations to be excised and the scope of the therapy directed, we are left with the conviction that, without the guidance now provided by *Rhodes v. Chapman*, the district court adopted some remedies that are not essential for the elimination of unconstitutional prison conditions. Taken as a whole, the district court's decree administers a massive curative dose when it is not yet demonstrable that a lesser therapeutic measure would not suffice. Conservative treatment is essential because it is more readily administered, less costly to the state, and not irreversible. Therefore, the remedy should begin with what is absolutely necessary. If

(10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

**139.** *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d at 566.

**140.** *Williams v. Edwards*, 547 F.2d at 1212; *Newman v. Alabama*, 503 F.2d 1320, 1332–33 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *United States v. City of Parma*, 661 F.2d 562, 576 (6th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 145 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

**141.** *See* Special Project, *The Remedial Process in Institutional Reform Litigation*, 78 Colum.L. Rev. 784, 864–66 (1978); *Developments in the Law—Section 1983 and Federalism*, 90 Harv.L. Rev. 1133, 1247–50 (1977); *cf. Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 410, 97 S.Ct.

2766, 2770, 53 L.Ed.2d 851, 857 (1977) (school desegregation).

**142.** *Rizzo v. Goode*, 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561, 574 (1976).

**143.** Special Project, *supra*, 78 Colum.L.Rev. at 869; *accord, Resident Advisory Bd. v. Rizzo*, 564 F.2d at 149 ("federal equitable relief must be carefully tailored to be no more intrusive than is necessary to remedy proved constitutional violations"); *see Dayton Bd. of Educ. v. Brinkman*, 433 U.S. at 419–20, 97 S.Ct. at 2775, 53 L.Ed.2d at 862–863; *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544–45, 47 L.Ed.2d 792, 801 (1976); *Morgan v. Kerrigan*, 530 F.2d 401, 429 (1st Cir.) ("the most reliable and least intrusive method"), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976).

**144.** *See Webster Eisenlohr, Inc. v. Kalodner*, 145 F.2d 316, 318 (3d Cir. 1944), *cert. denied*, 325 U.S. 867, 65 S.Ct. 1404, 89 L.Ed. 1986 (1945).

these measures later prove ineffective, more stringent ones should be considered. We turn now to the specifics.

### 6.51 Overcrowding: Space Requirements

 Neither the number of inmates in one cell nor the amount of space provided for an inmate in a dormitory alone determines whether confinement is cruel and unusual. *See Ruiz VI*, 666 F.2d at 858. If an inmate uses his living quarters only for sleeping, and is not threatened with violence, a single bunk space, eighteen or twenty square feet, may be adequate.[145] The district judge found that the crowding of persons, the consequent effect on prison services and facilities, and the lack of security are specific conditions that combine to make confinement at TDC uncivilized and inhumane. However, we cannot know whether the provision of additional guards and the consequent increase both in inmate security and in work opportunities, the diminished role of building tenders, and the various other remedial measures either incorporated in the consent decrees or approved by us elsewhere in this opinion will sufficiently relieve the conditions that combined to make double-celling cruel and unusual, with the result that confinement of two inmates to one forty-five-foot cell will be only the harshness sanctioned by *Rhodes*, or whether it will still be cruel and unusual.

Current estimates for maximum security prison cells suggest that their cost ranges from $30,000 to $60,000 apiece.[146] Approximately 10,000 additional cells would be required to house in a single cell every person now in a double cell less than sixty square feet in area. These additional cells, therefore, could cost at least $300,000,000 and require three to four years or more to build. Prisons once built cannot be readily adapted to other governmental uses.

 Constitutional rights are not, of course, confined to those available at modest cost.[147] The very concept of federalism, the division of powers among the branches of the federal government, and the nature of the safeguards imposed by the Bill of Rights and the fourteenth amendment levy costs impossible for an accountant to calculate, but esteemed by us because they are literally priceless.

 Yet in considering remedies for unconstitutional deprivation, the cost of one proposed remedy in comparison with the cost of others and the demonstrable need for the remedy should both be considered.[148] A remedy imposing great cost on a state should not be ordered unless its constitutional need has been demonstrated. Although we recognize the great discretion accorded a trial judge in fashioning reme-

---

145. *See Hoptowit v. Ray*, 682 F.2d at 1249 ("If prisoners need not remain in their cells for a substantial part of the day, analysis of square footage in cells may be largely irrelevant."); *Madyun v. Thompson*, 657 F.2d at 872 n.5 ("The constitutionality of double-celling involves an assessment of many factors, including, *inter alia* ... the opportunities for inmates to leave their cells during their normal prison routine."); *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980). *Compare Clay v. Miller*, 626 F.2d 345, 347 (4th Cir. 1980) (per curiam) *with Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979).

146. M. Sherman & G. Hawkins, Imprisonment in America 2 (1981).

147. *Todaro v. Ward*, 565 F.2d 48, 54 n.8 (2d Cir. 1977); *Finney v. Arkansas Bd. of Correction*, 505 F.2d 194, 201 (8th Cir. 1974); *see Watson v. City of Memphis*, 373 U.S. 526, 537, 83 S.Ct. 1314, 1321, 10 L.Ed.2d 529, 537 (1963);

*Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974); *State ex rel. Olson v. Maxwell*, 259 N.W.2d 621, 631–32 (N.D.1977).

148. *See Wright v. Rushen*, 642 F.2d 1129, 1134 (9th Cir. 1981); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979); *Campbell v. McGruder*, 580 F.2d 521, 540 (D.C.Cir.1978); *McMurry v. Phelps*, 533 F.Supp. 742, 769 (W.D.La. 1982); *cf. Scott v. Illinois*, 440 U.S. 367, 373, 99 S.Ct. 1158, 1162, 59 L.Ed.2d 383, 388 (1979) (appointment of counsel); *Bounds v. Smith*, 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72, 81 (1977) (access to courts). *See generally Weinberger v. Romero-Barcelo*, —— U.S. ——, ——, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91, 98 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").

dies,[149] the district judge here lacked the guidance of *Rhodes v. Chapman* and failed to consider the cost of the remedial measures ordered as well as the possibility of achieving constitutional conditions without requiring single-celling.

■ We turn to the dormitory space limitation. Neither sixty square feet, nor forty square feet, nor any other measure is constitutionally ordained. Yet the facts found serve as adequate basis to require more space for inmates confined in dormito- ries, not only to ameliorate living conditions but, more important, to enhance security and reduce violence. An inmate in a cell with one other person is exposed to assault only by that person; an inmate in an overcrowded dormitory having an inadequate security staff may be victimized by many. Moreover, a forty-square-feet-per-inmate dormitory space requirement will not occasion vast expense. At present, TDC is, by use of tents, providing forty square feet for most dormitory inmates.[150] Only 128 inmates are confined in dormitories that

149. *See* note 138 and accompanying text *supra.*

150. The following was calculated by the court using data contained in a TDC Housing Report:

INMATES HOUSED IN DORMITORIES
ACCORDING TO TDC HOUSING REPORT
MAY 1982

| UNIT | NUMBER OF DORMITORIES | 40 Sq. Ft. | 60 Sq. Ft. | NO. OF TENTS | NO. OF INMATES IN ADMINISTRATIVE SEGREGATION |
|---|---|---|---|---|---|
| Beto | –0– | –0– | –0– | –0– | 6 |
| Central | 12 | –0– | 118 | 51 | 7 |
| Clemens | 9 | –0– | 115 | 4 | 1 |
| Coffield | 5 | 38 [1] | 166 | –0– | 167 |
| Darrington | 10 | –0– | 140 | 56 | 64 |
| Diagnostic | 4 | –0– | 65 | 10 | –0– |
| Eastham | 12 | –0– | 327 | 35 | 17 |
| Ellis | 6 | 7 [2] | 189 | 30 | 30 |
| Ferguson | 6 | –0– | 178 | 10 | –0– |
| Gatesville | 23 | –0– | 93 [5] | –0– | 5 |
| Goree | 10 | –0– | 68 | –0– | 5 |
| Hilltop | 33 | –0– | 304 [6] | –0– | –0– |
| Huntsville | 12 | –0– | –0– | 6 | 15 |
| Jester I | 7 | –0– | 72 | 20 | –0– |
| Jester II | 5 | 4 | 48 | 11 | –0– |
| John Sealy | –0– | –0– | –0– | –0– | –0– |
| Mountain View | 15 | –0– | –0– | –0– | 13 |
| Pack I | 2 | –0– | 13 | 21 | –0– |
| Ramsey I | 10 | 3 [3] | 298 | 18 | 58 |
| Ramsey II | 15 | 46 | 241 | 21 | 5 |
| Retrieve | 8 | 30 [4] | 178 | 9 | 20 |
| Wynne | 11 | –0– | 218 | 24 | 41 |
| Total | | 128 | 2831 | | |

Heading for the first two data columns: NO. OF INMATES IN DORMITORIES IN EXCESS OF CAPACITY OF: (40 Sq. Ft. and 60 Sq. Ft.)

[1] 4 have 39+ sq. ft.

[2] 3 have 39 sq. ft.
4 have 38.69 sq. ft.

[3] 2 have 39 sq. ft.
1 has 39.77 sq. ft.

[4] 1 has 39.69 sq. ft.

[5] 2 have 59.5 sq. ft.

[6] 2 have 59 sq. ft.

house more than they would if there were forty square feet per inmate.

The requirement of sixty square feet per inmate, however, would necessitate the construction of facilities for 2,831 additional inmates. If it costs only $10,000 per inmate to construct a dormitory instead of the $30,-000 amount used to estimate the cost of constructing cells, the construction of dormitories for these additional inmates would cost almost $30,000,000.

▇ It has not been demonstrated that provision of additional security guards and the other measures required by the district court's decree and the two consent decrees will not remedy the constitutional deficiency. It appears desirable, therefore, first to undertake measures that will not be both costly and irreversible. If these measures do not work, then additional ones may be necessary. This "wait and see" approach ensures that the intrusion into state processes will be no greater than that required to achieve compliance with the Constitution.

▇ Accordingly, we affirm the provisions of the district court's decree that restrict TDC's acceptance of inmates to be housed in dormitories to those inmates who can be accommodated with a space of at least forty square feet.[151] We vacate the provisions of the decree that require (1) single-celling and (2) sixty square feet per inmate in dormitories.[152] This is without prejudice to the right of plaintiffs and plaintiff-intervenor to move for a further hearing, to be held one year after our order becomes effective, to determine whether, despite changes in prison conditions wrought as a result of it, compliance with constitutional requirements requires additional restrictions on inmate capacity. This is also without prejudice to the correlative right of TDC to seek a relaxation of the decree if TDC can demonstrate that the Constitution does not compel continuance of the decree.

**6.52 Other Measures To Relieve Overcrowding**

▇ The mandate that TDC must use good time, parole, and furlough programs to relieve overcrowding unnecessarily invades the management responsibility of state officials. Moreover, it requires detailed supervision of programs that relate only indirectly to the conditions of confinement. Directing state officials to achieve specific results should suffice; how they will achieve those results must be left to them unless and until it can be demonstrated judicial intervention is necessary. They may elect to balance prison population and physical facilities by parole, furloughs, pardons, confinement in county institutions, use of minimum security institutions for some inmates, changes in sentencing policies, or in other ways.

▇ However inefficient the management of large prisons may be when compared with the administration of smaller ones, and however desirable it may be to locate prisons near large communities, the failure to do either does not cause confinement to be cruel and unusual. Palaces may be erected in the wilderness. Large prisons may be impersonal but they are not necessarily inhumane. There is of course some relationship between the new-facilities provisions of the district court's decree and the amelioration of prison conditions, but the measure of therapeutic effect is patently small. The effect of these remedial measures does not appear to us sufficient to warrant their economic cost, their intrusion on state decisionmaking, or the supervisory burden that their administration would impose on a federal court. Therefore, we vacate Parts I(A)(1), I(A)(3)–(6), VII, and VIII of the district court's decree.

**6.53 Staff Training**

▇ The decree specifies how correctional officers will be schooled. If correctional officers are hired and trained, we must assume, until the contrary is shown, that they will be both trained and utilized

---

**151.** Parts I(B)(2), I(F) (in part).

**152.** Parts I(B)(3)–(4), I(E), I(F) (in part).

with some minimal degree of wisdom. If, after they are employed, it is demonstrated that TDC officials are still violating inmates' constitutional rights, additional steps can then be taken. Here again, we deem the "wait and see" policy, rather than radical surgery, more in keeping with the constitutionally reparative function of the injunction.

Accordingly, we vacate Part II(B) of the district court's decree. This is without prejudice to the right of plaintiffs and plaintiff-intervenor to move for a further hearing, to be held one year from the date our order becomes effective, seeking further relief, or the correlative right of TDC to seek relaxation of the decree.

### 6.54 Classification of Inmates

██ The decree requires only the filing of a plan. We affirm this provision of the decree without prejudice to the right of any party to object to the plan or to any court order adopted after the plan is submitted.[153]

### 6.6 *The Constitutional Standard for Medical Care: Huntsville Unit Hospital*

The first consent decree disposes of all issues pertaining to medical care except the provision in the district court's decree restricting the use of Huntsville Unit Hospital ("HUH") to infirmary purposes, prohibiting treatment at HUH of inmates from any unit other than Huntsville, and requiring TDC to provide inmates with adequate hospital facilities meeting the Standards of the Texas Hospital Association ("THA") or the Joint Commission on Accreditation of Hospitals ("JCAH").[154] We, therefore, consider only conditions at HUH.

██ The state has an "obligation to provide medical care for those whom it is punishing by incarceration."[155] "[A]cts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" of inmates constitute cruel and unusual punishment.[156] Neither inadvertent failure to provide adequate medical care,[157] nor carelessness,[158] nor even deliberate failure to conform to the standards suggested by experts is cruel and unusual punishment. The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare and Medicaid provide for the aged or the needy.[159] It prohibits only "deliberate indifference to serious medical needs".[160]

██ HUH is not an accredited hospital. It is outmoded and inadequate.[161] There

---

153. *Cf. Rhodes v. Chapman,* 452 U.S. at 344 n.9, 101 S.Ct. at 2397 n.9, 69 L.Ed.2d at 67 n.9 (district court rejected five plans filed by defendants, then ordered defendants to implement court's plan).

154. Part III. The decree provides that TDC may avoid the restrictions on HUH's function and its intake of inmates by bringing HUH into compliance with these Standards.

155. *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976).

156. *Id.* at 106, 97 S.Ct. at 292, 50 L.Ed.2d at 261; *accord, Dickson v. Colman,* 569 F.2d 1310, 1311 (5th Cir.) (per curiam), *cert. denied,* 439 U.S. 897, 99 S.Ct. 259, 58 L.Ed.2d 244 (1978).

157. *Estelle v. Gamble,* 429 U.S. at 105–06, 97 S.Ct. at 292, 50 L.Ed.2d at 260–261; *Young v. Gray,* 560 F.2d 201 (5th Cir. 1977) (per curiam); *see Williams v. Treen,* 671 F.2d at 901.

158. *See Estelle v. Gamble,* 429 U.S. at 105, 97 S.Ct. at 291, 50 L.Ed.2d at 260; *Williams v. Treen,* 671 F.2d at 901.

159. "[T]he essential test is one of medical necessity and not one simply of desirability." *Woodall v. Foti,* 648 F.2d 268, 272 (5th Cir. 1981) (per curiam); *see Layne v. Vinzant,* 657 F.2d 468, 473 (1st Cir. 1981); *Brown v. Beck,* 481 F.Supp. 723, 726 (S.D.Ga.1980); *Russell v. Enser,* 496 F.Supp. 320, 328 (D.S.C.1979), *aff'd mem.,* 624 F.2d 1095 (4th Cir. 1980).

160. *Estelle v. Gamble,* 429 U.S. at 104, 106, 97 S.Ct. at 291, 292, 50 L.Ed.2d at 260, 261; *accord, Williams v. Treen,* 671 F.2d at 901 ("knowing and willful failure to provide or permit a prisoner access to needed medical care"); *Fielder v. Bosshard,* 590 F.2d 105, 109 (5th Cir. 1979) ("deliberate or callous indifference to [inmate's] serious medical needs").

161. Its condition is described in a recent TDC budget request:

A new T.D.C. hospital is required to replace the facility currently in use on the Huntsville Unit. The present structure is obsolete, over forty years old, alarmingly overcrowded, lacking any egress, other than a single stair-

was testimony that the effects of inadequate physical facilities are aggravated by deficiencies in sanitation and infection control; the number of physicians is inadequate; and TDC improperly relies on inmate medical assistants, who lack adequate training, for medical care. Inmate assistants have amputated fingers, set bones, applied casts, sutured wounds, repaired Achilles' tendons, given injections, administered medications, and kept records. Inmates, in many instances lacking adequate training, also serve as laboratory technicians, X-ray technicians, physical therapists, respiratory therapists, first aid attendants, and medical records clerks. Many of the inmates assigned to these tasks are uneducated and some are illiterate. The district court found "numerous" instances of "[g]rievous neglect of the personal care of patients at the HUH," [162] but nothing in the findings indicates either that these are imminent in the hospital or that they are not remediable by a larger and better-trained staff.

JCAH standards are applied to hospitals in Texas by THA. Although HUH does not meet these standards, the record establishes that no prison hospital in any other state does. Some Federal Bureau of Prisons hospitals meet them but others do not. Of the 7,000 private hospitals in the United States, only 3,000 meet JCAH standards adequately for full accreditation and an additional 1,000 are on probation or one-year accreditation; the other 3,000 are not accredited because they do not meet the standards. Literally millions of persons receiving private medical care are being treated in hospitals that do not meet the requirements imposed by the district court's decree.

█ Expert standards are a useful guide but they are not a constitutional measure.[163] Restricting use of HUH to Huntsville inmates and permitting it to render only infirmary care do not solve the medical care problem. Moreover, there have been additional developments since the district court issued its decree. By orders dated October 19, 1981, and November 5, 1981, the district court stayed the provision of its decree pertaining to HUH. In its October 19 order, the district court directed TDC to file a formal response to particular suggestions made by the plaintiffs concerning HUH. TDC filed this response. In the court's November 5 order, TDC's response is described as exhibiting "a commendable air of conciliation." That order further directs the parties to meet and discuss possible agreement on continued operation of HUH.

█ Accordingly, we vacate the provision of the district court's decree pertaining to the HUH and remand that issue to the district court for further proceedings consistent with this opinion after the district court has received a report concerning the results of the discussion it has ordered. Should the district court consider injunctive relief still necessary, its order shall not command the closing of HUH or restrict its use solely to Huntsville inmates. The order should instead be limited to requiring that TDC provide the minimum level of hospital care required by the Constitution.

### 6.7 Double-Celling and Exercise for Inmates in Administrative Segregation

Some inmates are confined to cells in a separate part of each unit for a variety of nonpunitive reasons. Some are confined pending investigation of potential disciplinary charges; others are confined awaiting a hearing after charges are filed; still others are confined because they need protec-

---

well and one unreliable elevator; has completely inadequate wiring and plumbing; prohibits the expansion and/or addition of essential diagnostic and treatment capabilities, and is wholly incapable of functioning as a hospital for the continually growing inmate population.

HUH has since been improved somewhat and a major new hospital facility at the John Sealy Hospital in Galveston is nearing completion.

**162.** 503 F.Supp. at 1312.

**163.** *Bell v. Wolfish*, 441 U.S. at 543 n.27, 99 S.Ct. at 1876 n.27, 60 L.Ed.2d at 471 n.27; *see Ramos v. Lamm*, 639 F.2d at 567 n.10; note 182 and accompanying text *infra*.

tive custody, because they are security risks, or because, after being punished, they cannot safely be returned to the regular prison population.[164]

In the past, inmates sometimes were confined in administrative segregation for lengthy periods without any evaluation by prison officials of the reasons for the confinement; however, TDC policy now requires periodic review of the reasons for this confinement after the inmate has been in administrative segregation thirty to forty-five days. The review is repeated every ninety days thereafter.[165] In addition, the first consent decree requires TDC to file with the district court a plan setting forth (1) the circumstances under which inmates may be confined in administrative segregation; (2) confinement procedures conforming to the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976) (three-judge court), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); and (3) procedures for regular and frequent review of the status of each inmate so confined as well as the standards for such review.

Aside from matters disposed of by the first consent decree, the district court's decree requires two special relief measures for inmates in administrative segregation: not more than one inmate may be confined in a cell containing sixty square feet or less, Part IV(C)(3), and each inmate must be afforded the opportunity for at least one hour of exercise a day if he is in administrative segregation for more than three consecutive days, Part IV(C)(1).

In *Rhodes v. Chapman*, the Court declined to find cruel and unusual punishment in the practice of confining two inmates on "restrictive classification" to a cell.[166] The inmates so confined in *Rhodes* had been found guilty of rule infractions after a hearing or were " 'there by "choice" at least to some degree.' "[167] Although most of the TDC inmates in administrative segregation have not yet been found responsible for rule violations, we are unable to perceive that punishment that is not cruel and unusual for an established rule infraction is so harsh as to be condemned if imposed only after compliance with the procedures now in force or soon to be in force at TDC. Accordingly, we vacate Part IV(C)(3) of the district court's decree.

Whether the failure to afford inmates the opportunity to exercise is cruel and unusual punishment was considered by us in *Jones v. Diamond, supra,* in which, equally divided, we affirmed the district judge's denial of relief.[168] That case, however, involved a county jail in which most of the inmates were confined for relatively brief periods.[169] We deal here with a maximum security prison in which, under our disposition of this case, two persons could be confined in a forty-five-square-foot cell too small to permit any real exercise, for almost twenty-four hours a day. This confinement is continual, unbroken by work assignment, school, or other outside activity. Moreover, although a confined inmate's status is subject to regular review to determine whether the necessity for administrative segregation still exists, this review is no guarantee that

---

**164.** 503 F.Supp. at 1365.

**165.** *Id.* at 1364.

**166.** *See* 452 U.S. at 349 n.15, 101 S.Ct. at 2400 n.15, 69 L.Ed.2d at 71 n.15.

**167.** *Id.* (quoting *Chapman v. Rhodes*, 434 F.Supp. 1007, 1013 (S.D.Ohio 1977)).

**168.** 636 F.2d at 1376.

**169.** *See Hutto v. Finney*, 437 U.S. at 686, 98 S.Ct. at 2571, 57 L.Ed.2d at 531 ("[T]he length of confinement cannot be ignored in deciding

whether the confinement meets constitutional standards."); *Smith v. Sullivan*, 553 F.2d 373, 379 (5th Cir. 1977) ("types of inmates and the lengths of their stays in the jail"); *cf. Cruz v. Hauck*, 515 F.2d 322, 333 (5th Cir. 1975) (county jail; access to courts) ("inmates whose confinement is of a very temporary nature"), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976); *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (county jail) ("In determining maximum occupancy, we consider that most inmates are confined in the jail for relatively short periods of time.").

the inmate will be released from segregation at an early date.[170]

Other courts have held that inmates need regular exercise to maintain reasonably good physical and psychological health.[171] Although deprivation of exercise is not per se cruel and unusual punishment, in particular circumstances "a deprivation may constitute an impairment of health forbidden under the eighth amendment." [172] Courts have frequently stated that confinement of inmates for long periods of time without opportunity for regular physical exercise constitutes cruel and unusual punishment.[173]

Of particular importance in determining an inmate's need for regular exercise are the size of his cell,[174] the amount of time the inmate spends locked in his cell each day,[175] and the overall duration of his confinement.[176] These together with the inmate's physical and other needs must be determined on the facts of each case and the evidence in each case should support the existence of any health hazard under the

specific circumstances involved. Such specific testimony was lacking in this case.

Examining the decree, however, in the light of the facts we have summarized, we conclude that the district court acted within its discretion in prescribing the exercise requirement.[177] In doing so, we do not intimate that, upon a proper evidentiary showing, the decree may not be modified in such details as the amount of time daily or the number of days each week that inmates must have the opportunity to exercise.

For these reasons, we affirm Part IV(C)(1) of the district court's decree.

### 6.8 Fire Safety

The district court found the TDC prisons "woefully deficient in the number of fire exits .... The few available exits in the housing areas are too small and inadequately constructed to serve effectively during an actual fire." [178] A similar problem in work areas creates a "potential for serious

---

**170.** *See Ruiz VI*, 666 F.2d at 859. "[M]any prisoners have been held in administrative segregation for months at a time." *Id.* Part IV(C)(1) does not apply to inmates placed in administrative segregation for short-term confinement, *i.e.*, three days or less.

**171.** *See Campbell v. Cauthron*, 623 F.2d at 506–07; *Spain v. Procunier*, 600 F.2d at 199; *Hendrix v. Faulkner*, 525 F.Supp. 435, 523 (N.D.Ind.1981); *Frazier v. Ward*, 426 F.Supp. 1354, 1369 (N.D.N.Y.1977).

**172.** *Miller v. Carson*, 563 F.2d at 751 n.12.

**173.** "[F]ailure to provide physical exercise for an unreasonable period of time constitutes a threat to the well-being of the prisoners. It also exhibits a callous indifference to the health needs of a captive population. It is, therefore, cruel and unusual punishment....

. . . [C]oncern for the health of inmates isolated from the rest of the [prison] population indicates that ... they must be given sufficient opportunities to exercise."
*Laaman v. Helgemoe*, 437 F.Supp. 269, 309, 310 (D.N.H.1977); *see Smith v. Sullivan*, 553 F.2d at 379 (dictum) (quoting *Sinclair v. Henderson*, 331 F.Supp. 1123, 1131 (E.D.La.1971)); *Kirby v. Blackledge*, 530 F.2d 583, 587 (4th Cir. 1976); *Dawson v. Kendrick*, 527 F.Supp. 1252, 1298 (S.D.W.Va.1981); *Parnell v. Waldrep*, 511

F.Supp. 764, 771 (W.D.N.C.1981); *Feliciano v. Barcelo*, 497 F.Supp. 14, 34 (D.P.R.1979).

**174.** *See Parnell v. Waldrep*, 511 F.Supp. at 770 ("area does not provide adequate opportunity for physical exercise").

**175.** *See Clay v. Miller*, 626 F.2d at 347; *Campbell v. Cauthron*, 623 F.2d at 505, 507; *McGruder v. Phelps*, 608 F.2d 1023 at 1025 (5th Cir.); *Spain v. Procunier*, 600 F.2d at 199; *Dawson v. Kendrick*, 527 F.Supp. at 1300; *Parnell v. Waldrep*, 511 F.Supp. at 770.

**176.** *See McGruder v. Phelps*, 608 F.2d at 1025; *Spain v. Procunier*, 600 F.2d at 199; *Campbell v. McGruder*, 580 F.2d at 548; *Dawson v. Kendrick*, 527 F.Supp. at 1300; *Parnell v. Waldrep*, 511 F.Supp. at 771.

**177.** The possibility that the exercise requirement will be impermissibly intrusive is less than it would be if, for example, TDC had already prescribed a reasonable, although different, program of exercise for inmates in administrative segregation. *See Dorrough v. Hogan*, 563 F.2d 1259, 1264 (5th Cir. 1977) (per curiam) (affirming on basis of district court's orders), *cert. denied*, 439 U.S. 850, 99 S.Ct. 153, 58 L.Ed.2d 153 (1978).

**178.** 503 F.Supp. at 1373.

injury in the face of a disaster." [179] Concluding that these conditions violate the eighth amendment, the district court ordered TDC to "comply with the current edition of the Life Safety Code of the National Fire Protection Association." [180]

The record contains no evidence either of a single fatality or a serious injury at TDC caused by fire or smoke inhalation in the recent past. Although there is danger from inflammable materials used inside the buildings, the buildings themselves are built of materials that do not burn easily.

TDC unquestionably has a duty to provide adequate fire safety for its inmates.[181] The deficiencies in fire safety found at TDC, however, do not constitute cruel and unusual punishment, either alone or in combination with the other conditions in its prisons. Indeed, the fire safety problems have little connection with the other conditions found to violate the eighth amendment. Moreover, although the standards set by private organizations' safety codes "may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." [182]

The "totality of the circumstances" test does not authorize us to reform all deficient prison conditions. The remedy must be confined to the elimination of those conditions that together violate the Constitution. If the cruelty of confinement is thus eliminated, we have no mandate to go further in an effort to require the state to ameliorate the prison environment.

For these reasons, we vacate the provision of the decree relating to fire safety.

## VII. DUE PROCESS ISSUES

### 7.1 Access to Courts

Ready access to the courts is a "fundamental constitutional right." [183] Regulations and practices that unjustifiably obstruct such access are invalid.[184] Access to courts entails not only freedom to file pleadings but also freedom to employ, without retaliation or harassment,[185] those accessories without which legal claims cannot be effectively asserted: a law library containing basic legal materials; legal assistance both from lawyers and from other inmates; and the ability to communicate with courts, attorneys, and public officials.[186]

The district court found "a persistent pattern of TDC interference with attempts by inmates to pursue legal actions." [187] Although the disruption is not uniform throughout TDC, "[p]ractices and policies at the various units significantly restrict the times and places inmates may work on legal matters, severely inhibit communication among inmates about legal matters, encumber inmate efforts to have legal papers notarized, encourage the discriminatory

---

**179.** *Id.; see id.* at 1374.

**180.** Part VI(A).

**181.** *See Leeds v. Watson,* 630 F.2d 674, 675–76 (9th Cir. 1980); *Dimarzo v. Cahill,* 575 F.2d 15, 16, 19 (1st Cir.), *cert. denied,* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978).

**182.** *Bell v. Wolfish,* 441 U.S. at 543 n.27, 99 S.Ct. at 1876 n.27, 60 L.Ed.2d at 471 n.27; *accord, Rhodes v. Chapman,* 452 U.S. at 348 n.13, 101 S.Ct. at 2400 n.13, 69 L.Ed.2d at 70 n.13; *Hoptowit v. Ray,* 682 F.2d at 1246, 1256; *Jordan v. Wolke,* 615 F.2d 749, 753 n.2 (7th Cir. 1980).

**183.** *Bounds v. Smith,* 430 U.S. at 828, 97 S.Ct. at 1498, 52 L.Ed.2d at 83; *accord, Cruz v. Hauck,* 475 F.2d 475, 476 (5th Cir. 1973).

**184.** *E.g., Procunier v. Martinez,* 416 U.S. at 419, 94 S.Ct. at 1814, 40 L.Ed.2d at 243; *see Ex parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 642, 85 L.Ed. 1034, 1035 (1941).

**185.** *Campbell v. Beto,* 460 U.S. 765, 768 (5th Cir. 1972); *Andrade v. Hauck,* 452 F.2d 1071, 1072 (5th Cir. 1971).

**186.** *See Bounds v. Smith,* 430 U.S. at 825–28, 97 S.Ct. at 1496–98, 52 L.Ed.2d at 81–83; *Wolff v. McDonnell,* 418 U.S. at 577–80, 94 S.Ct. at 2985–86, 41 L.Ed.2d at 963–964; *Corpus v. Estelle,* 551 F.2d 68, 70–71 (5th Cir. 1977); *Novak v. Beto,* 453 F.2d 661, 663–64 (5th Cir. 1971), *cert. denied,* 409 U.S. 968, 93 S.Ct. 279, 34 L.Ed.2d 233 (1972).

**187.** 503 F.Supp. at 1367.

harassment of inmates who take their grievances to court, and intrude on the communications between attorneys and their inmate clients." [188] At some units, inmates were forbidden to work on legal matters during their free time in their cells or even to keep any legal papers there; at others, inmates were permitted to do legal work only in their cells, where they were crowded, lacked a desk or other firm writing surface, and often lacked books. [189] The district court found that space limitations in TDC's libraries do not justify TDC's restrictive access rules as applied, for there were frequently empty seats in the libraries. [190] The court held that strip searches of inmates entering or leaving the library were unwarranted harassment. [191]

■ TDC argues that the district court was "apparently willing to listen to only one side of the story" on this issue. It contends also that the practices condemned by the district court were not "adopted and enforced by the official defendants." [192] This argument, however, is but a comment on the court's evaluation of credibility; for, although TDC officials testified to the contrary, there was ample evidence to support the district court's conclusions.

■ Although systemwide injunctive relief may not be predicated on individual misconduct that "is not part of a pattern of persistent and deliberate official policy," [193] an institutional practice may be sufficiently

prevalent to warrant such relief even though it is not embodied in regulations or imposed by official fiat. [194] Executives have a duty to control their subordinates. [195]

■ The evidence was sufficient to warrant the inference drawn by the district court that, although the disruptive policies he found were not formally sanctioned, they occurred so frequently and were so pervasive that they reflected a pattern of misconduct. While the case was pending, the district judge issued five separate protective orders to minimize what he found to be TDC harassment of the plaintiffs and witnesses in this case. [196] On the record before us, we cannot conclude that the district court's findings were clearly erroneous. [197]

■ The district court's decree enjoins TDC from unlawfully interfering with inmates' access to courts, counsel, and public officials. The decree prohibits censorship of attorney-client mail, ensures confidential attorney-client interviews, prohibits retaliation against inmates who complain of prison conditions or official misconduct, and requires that inmates have access to services and materials that would help them process their legal matters. [198] TDC does not contend that any of these provisions of the decree exceeds the district court's authority. Because TDC has failed to eliminate these prevalent practices, which it contends it has

188. Id.

189. Id. at 1367–68.

190. Id. at 1368.

191. Id. at 1369, 1372 & n.207.

192. Lewis v. Hyland, 554 F.2d 93, 98 (3d Cir.), cert. denied, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977).

193. Campbell v. McGruder, 580 F.2d at 526; see Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d at 561 (1976).

194. See Dimarzo v. Cahill, 575 F.2d at 17–18.

195. Cf. Little v. Walker, 552 F.2d 193, 197 (7th Cir. 1977) ("a prison official may not take solace in ostrichism"), cert. denied, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978).

196. 503 F.Supp. at 1372. This court reviewed TDC's appeal from one of these protective orders in Ruiz v. Estelle, 550 F.2d 238 (5th Cir. 1977) (per curiam) (Ruiz II).

197. TDC also contends the district court erred because it held that TDC had the "burden of demonstrating that the legal needs of the prison population are served by the existent [TDC] programs." 503 F.Supp. at 1371. This contention lacks merit. "The state has the affirmative duty to provide constitutionally adequate access [to the courts], and bears the burden of demonstrating the adequacy of the chosen method." Storseth v. Spellman, 654 F.2d 1349, 1352 (9th Cir. 1981) (citations omitted); see Novak v. Beto, 453 F.2d at 663, 664.

198. Part V.

never condoned, these provisions were appropriate.

▮ TDC contends that, after our decision in *Corpus v. Estelle*, 551 F.2d 68 (5th Cir. 1977), TDC's practice of prohibiting inmates from giving or receiving actual legal assistance to or from each other was terminated. Whether or not all vestiges of this practice have been eliminated, the injunction that we affirmed in *Corpus* provides an adequate remedy for it. The decree in this case, therefore, must be modified to eliminate the duplication. We do not find the district court's remedy in other respects either disproportionate to the conditions found or unduly intrusive on the state. Therefore, we affirm Part V of the district court's decree, except for Part V(J), which we vacate.

### 7.2 *Disciplinary Hearings*

The district court found a number of violations of inmates' right to due process in the administration of prison discipline.[199] Some of these violations have been remedied by the first consent decree; others are addressed in Part IV of the district court's decree. In this appeal, apart from the provisions dealing with administrative segregation, TDC objects only to a prophylactic provision that requires it to tape record or in some other way make a verbatim record of all disciplinary hearings, preserve the recordings for at least one year, and follow

prescribed procedures for making the recordings available to inmates or their legal representatives.[200]

▮ TDC correctly points out that *Wolff v. McDonnell* holds that the Constitution requires only "a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action."[201] It does not require tape recordings. TDC argues that the possibility that a recording would be released might inhibit the willingness of inmates to testify against other inmates. It also argues that the existence of recordings creates the possibility of inadvertent disclosure of confidential information by counsel or a TDC employee.

The district court found that TDC had not maintained adequate written records of its disciplinary proceedings.[202] Its decree is aimed directly at preventing any recurrence of that constitutional lapse.[203] Nothing in the decree forbids TDC to take measures to ensure the confidentiality of the recordings. Indeed the district court took account of security concerns by permitting TDC to exclude from release to an inmate any portion of a recording containing material that was recorded while the inmate "was excluded from the hearing for security reasons."

▮ It is well-settled that, under the fourteenth amendment, a court may require remedial measures that the Constitution does not of its own force initially require.[204] Injunctive relief need not be confined to an

---

**199.** 503 F.Supp. at 1346–67.

**200.** Part IV(B). The district court explained the rationale behind this provision:

Given TDC's failure to observe the requirements of due process, as well as its own written rules, in conducting disciplinary hearings, all such hearings which it conducts in the future must be recorded by tape recorder or by an equally efficient method. 503 F.Supp. at 1358.

**201.** 418 U.S. at 564, 94 S.Ct. at 2979, 41 L.Ed.2d at 955 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484, 499 (1972)).

**202.** *See* 503 F.Supp. at 1350, 1352–53.

**203.** *Cf. Hutto v. Finney*, 437 U.S. at 687, 98 S.Ct. at 2572, 57 L.Ed.2d at 532 ("[T]aking the long and unhappy history of the litigation into

account, the court was justified in entering a comprehensive order to insure against the risk of inadequate compliance."); *Hoptowit v. Ray*, 682 F.2d at 1247 ("a record of past constitutional violations and violations of past court orders").

**204.** *See, e.g., North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586, 589 (1971); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. at 15–16, 91 S.Ct. at 1276, 28 L.Ed.2d at 566. "To prevent further constitutional deprivations, a court may order forms of relief not normally required by the Constitution but nevertheless necessary given the circumstances if the court's efforts are to be successful." *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir. 1980).

order to cease an illegal practice. Once a constitutional violation has been proved, the court may, if necessary, exert its equitable power to prevent repetition of the violation, not only by the force of the contempt sanction but also by commanding measures that safeguard against recurrence.[205] The tape recording provision imposes little expense or inconvenience on TDC, does not change the manner in which state officials discharge their duties, is narrowly focused to prevent repetition of a proved constitutional violation, and is not unnecessarily intrusive on state functions. The district court did not, therefore, abuse its discretion by imposing this requirement.

## VIII. OTHER CONDITIONS OF CONFINEMENT: THE PENDENT STATE LAW CLAIMS [206]

Neither the plaintiffs nor the United States asserted any claims under Texas law. In their Amended Complaint, the plaintiffs allege that their living and working conditions are "inadequate and dangerous," and that TDC's "industries and work areas fail to meet applicable minimum health and safety standard[s]." These allegations, however, are followed by the assertion that these alleged deficiencies violate the United States Constitution. The Amended Complaint does not mention Texas law, nor does the Complaint in Intervention filed by the United States.[207] Like the Amended Complaint, the Complaint in Intervention asserts that various alleged deficiencies in the living and working conditions at TDC violate the United States Constitution.

After the lengthy trial was completed, the district court directed the parties to brief the applicability of various Texas health and safety statutes. Although TDC contends that these statutes do not apply to state agencies, the district court held that they apply to TDC.[208] It then concluded that enforcement of these statutes would remedy the harmful conditions it found and that, therefore, it was unnecessary to decide the constitutional claims.[209]

Plaintiffs defend the district court's disposition as the least intrusive means of dealing with these conditions, and as an appropriate exercise of the court's power and discretion under the doctrine of pen-

---

**205.** See Smith v. Sullivan, 611 F.2d at 1044 ("[T]he federal courts have the power, and the duty, to make their intervention effective."); Special Project, supra, 78 Colum.L.Rev. at 863.

**206.** The United States takes no position on this issue.

**207.** Cf., e.g., Miller v. Carson, 563 F.2d at 758 (plaintiff alleged violations of "certain statutory rights under Florida law"); Taylor v. Sterrett, 344 F.Supp. 411, 412 (N.D.Tex.1972) (plaintiffs alleged that defendants "failed to comply with State law regarding the operation and supervision of the county jail"), aff'd, 499 F.2d 367, 368 (5th Cir. 1974), cert. denied, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975).

**208.** 503 F.Supp. at 1378–82. TDC argues that the following state statutes do not apply to it: Tex.Rev.Civ.Stat.Ann. art. 4476–5 (Vernon 1976 & Cum.Supp.1982) (Food, Drug and Cosmetic Act); id. art. 4476–7 (Vernon 1976) (Meat and Poultry Inspection Act); id. art. 4476–9 (Sterilization of dishes; broken or cracked dishes and unlaundered napkins); id. art. 4476–10 (Sanitary employees where food or drink is handled);

id. art. 4477–1 (Vernon 1976 & Cum.Supp. 1982) (Minimum standards of sanitation and health protection measures); id. art. 4420 (Vernon 1976) (empowering Texas Department of Health Resources to enter and inspect public places and public buildings); id. arts. 5173–5179, 5182, 5182a (Vernon 1971 & Cum.Supp.1982) (Industrial health, safety, and hygiene); id. art. 165–3 (Vernon 1969 & Cum.Supp. 1982) (Milk grading and pasteurization); Tex.Agric.Code Ann. §§ 132.001 to .084 (Vernon 1982) (Egg Law) (replacing Tex.Rev.Civ. Stat.Ann. art. 165–8 (repealed 1981)). TDC agrees that the following statutes apply to it: Tex.Rev.Civ.Stat.Ann. art. 4477–5 (Vernon 1976 & Cum.Supp.1982) (Clean Air Act); id. art. 4477–7 (Solid Waste Disposal Act); id. art. 3959 (Vernon 1966) (Fire Escape Law).

**209.** 503 F.Supp. at 1382. The district court did, however, find that the statutory fire safety standards were inadequate to remedy alleged fire safety deficiencies in TDC, so it addressed the constitutional issue presented by those allegations. Id. at 1382–83; see pp. 1152–1153 supra.

dent jurisdiction. Their argument blends two distinct doctrines: pendent jurisdiction over state law claims and judicial self-restraint to avoid deciding issues on constitutional grounds when they can be decided on some other basis.[210]

Federal courts are necessarily confined to the limited jurisdiction granted by article III and by act of Congress.[211] However, the Supreme Court has long held that the Constitution does not prohibit the assertion of state law claims that form a separate but parallel ground for relief also sought in a substantial claim based on federal law.[212] The trial court's jurisdiction over state law claims is ultimately a question of judicial power under the Constitution. The definition of that power is not to be crabbed.[213] In *United Mine Workers v. Gibbs*, the Court held:

"Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their authority * * *,' U.S.Const., Art.

III, § 2, and the relationship between that claim and the state claim [asserted by the plaintiff] permits the conclusion that the entire action before the court comprises but one constitutional 'case.' "[214]

"The state and federal claims must derive from a common nucleus of operative fact."[215] But if the plaintiff's claims "are such that *he* would ordinarily be expected to try them all in one judicial proceeding, then ... there is *power* in federal courts to hear the whole."[216] "That power," the Court continued, "need not be exercised in every case in which it is found to exist."[217] The jurisdiction is discretionary, and "[i]ts justification lies in considerations of judicial economy, convenience and fairness to litigants."[218]

The *Gibbs* decision, like the others in this field, is predicated on the assumption that the *plaintiff* invokes the court's jurisdiction.[219] Indeed both of the leading treatises on federal civil procedure include pendent jurisdiction under the subject "Joinder of Claims."[220] Professor Moore states that it

---

210. No motion was made to amend the pleadings to conform to the evidence under Fed.R. Civ.P. 15, and it is not urged that the parties in fact litigated these issues, although expert witnesses did mention state law standards in their testimony. Therefore, we do not address any questions that such arguments might raise.

211. *E.g., Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 372, 98 S.Ct. 2396, 2401, 57 L.Ed.2d 274, 281 (1978); *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 548 (5th Cir. 1981).

212. *E.g., Siler v. Louisville & N.R.R.*, 213 U.S. 175, 181–191, 29 S.Ct. 451, 454–55, 53 L.Ed. 753, 755–757 (1909); *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738, 823, 6 L.Ed. 204, 224 (1824).

213. *United Mine Workers v. Gibbs*, 383 U.S. 715, 724–25, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218, 227 (1966).

214. *Id.* at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 227 (emphasis, brackets, and ellipsis in original).

215. *Id.*

216. *Id.* (first emphasis added).

217. *Id.* at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228.

218. *Id.*

219. "A pendent claim is a cause of action without independent federal jurisdictional basis, *brought by a party* who is also asserting a substantial federal claim." *Harris v. Steinem*, 571 F.2d 119, 122 n.7 (2d Cir. 1978) (emphasis added); *accord, Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 810 (2d Cir. 1979) ("Pendent jurisdiction as defined in *Gibbs* applies to state law claims which are joined in the complaint with federally cognizable claims and which are *asserted by the original plaintiff* against the original defendant.") (emphasis added); *see United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138, 16 L.Ed.2d at 227 ("a plaintiff's claims"); *id.* at 727, 86 S.Ct. at 1139–40, 16 L.Ed.2d at 228 ("recognition of a federal court's wide latitude to decide ancillary questions of state law does not mean that it must tolerate *a litigant's effort* to impose upon it what is in effect only a state law case") (emphasis added); *Blake v. Pallan*, 554 F.2d 947, 956 n.11 (9th Cir. 1977).

220. 3A J. Moore & J. Lucas, Moore's Federal Practice ¶ 18.07[1] (2d ed. 1982); 6 C. Wright & A. Miller, Federal Practice and Procedure § 1588, at 807 & n.84 (1971).

is unnecessary as a matter of pleading to assert that the case involves pendent jurisdiction but "it may avoid later difficulties if the pendent basis of the jurisdiction is plainly stated."[221] In some cases the act of assuming jurisdiction might, as Professor Moore suggests, indicate both the invocation of the court's jurisdiction and the court's decision to exercise its discretion.[222]

■ The pleadings in this case did not invoke the court's pendent jurisdiction and, as a result, exercise of that discretion was not even mentioned until after the lengthy trial on the merits had been completed. These factors would militate against the exercise of pendent jurisdiction even if the plaintiffs, and not the court, had invoked it at that belated time.[223]

The exercise of pendent jurisdiction is an expansive act, permitting disposition in one suit of both state and federal claims.

Avoiding decision of federal constitutional claims is, by contrast, an act of judicial self-restraint. The Supreme Court has repeatedly declared that it will decide federal constitutional issues only if necessarily compelled to do so in order to decide a case.[224] If possible, it will avoid deciding such issues by deciding instead a dispositive, pendent state law claim.[225]

■ The concept that a federal trial court may of its own volition, after trial, consider state law claims not pleaded by the plaintiffs does not appear consonant with either doctrine.[226] Not only does the court thus reshape the plaintiffs' suit, but it does so after trial when there is no opportunity to fashion proof or presentation directly to the state law issues.[227] Moreover, because the applicability of general Texas statutes to state agencies is unclear,[228] the district

---

**221.** 3A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 18.07[1.–5], at 18–73 (2d ed. 1982).

**222.** *Id.* at 18–73 to –74.

**223.** 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3567, at 455 (1975); *see Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 627, 94 S.Ct. 1323, 1336, 39 L.Ed.2d 630, 648 (1974).

**224.** *Rescue Army v. Municipal Court*, 331 U.S. 549, 568–75, 67 S.Ct. 1409, 1419–23, 91 L.Ed. 1666, 1677–1681 (1947); *Alabama State Fed'n of Labor Local 103 v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725, 1734 (1945); *Ashwander v. TVA*, 297 U.S. 288, 346–47, 56 S.Ct. 466, 483, 80 L.Ed. 688, 710–711 (1936) (Brandeis, J., concurring); *Liverpool, N. Y. & Philadelphia S. S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 38, 5 S.Ct. 352, 355, 28 L.Ed. 899, 901 (1885). "We note, though, that the doctrine that constitutional issues should be avoided where possible is not ironclad." *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 196 n.7 (5th Cir. 1980); *see Siler v. Louisville & N.R.R.*, 213 U.S. at 175, 29 S.Ct. at 455, 53 L.Ed. at 755.

**225.** *E.g., Hagans v. Lavine*, 415 U.S. 528, 546, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577, 593 (1974) (citing cases); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3567, at 454 (1975).

**226.** *Cf. Mayor of Philadelphia v. Educational Equality League*, 415 U.S. at 627, 94 S.Ct. at 1336, 39 L.Ed.2d at 648 ("pendent jurisdiction [is not] something akin to subject matter jurisdiction that may be raised *sua sponte* at any

stage and that is capable of aborting prior federal court proceedings"); *Allen v. Aytch*, 535 F.2d 817, 819–22 (3d Cir. 1976) (avoiding constitutional issue by remanding for determination of pendent issues of federal and local law first raised by *party* on appeal).

**227.** *Cf. Caserta v. Village of Dickinson*, 672 F.2d 431, 433 (5th Cir. 1982) ("a court should be reluctant to dismiss a pendent claim once substantial time and resources have been devoted *to such claims* and the court has heard the evidence and arguments on such issues") (emphasis added).

**228.** TDC argues that a Texas statute applies to the State of Texas "only when the act is made applicable to it by express terms or necessary implication." 53 Tex.Jur.2d *Statutes* § 32 (1964). The opinions of the Texas Attorney General holding two commercial regulatory statutes applicable to TDC, Tex. Att'y Gen. Op. Nos. M–651 (1970), M–651–A (1970), H–444 (1974), and the fact that the Texas Payment of Wages Act, Tex.Rev.Civ.Stat.Ann. art. 5159d § 4(b)(7) (Vernon 1971), specifically exempts inmates from its coverage are, to TDC, but exceptions that prove the rule. As TDC argues in its brief:

"[T]he State is ordinarily not within the purview of a statute unless the intention to include it is clearly manifest." *Allied Finance Co. v. State*, 387 S.W.2d 435, 438 (Tex.Civ. App.—Austin 1965, writ ref'd n. r. e.). None of the state health and safety statutes addressed by the district court, *see* 503 F.Supp. at 1378 n.212, are made applicable to the

court should have been reluctant to consider claims grounded on those statutes.[229] "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." [230]

We conclude that the district court should not have relied on pendent jurisdiction and should not, therefore, have decided these claims on the basis of state law.

■ We turn to the various health and safety deficiencies found by the district judge to appraise whether they, considered either alone or together with the other conditions at TDC, constitute cruel and unusual punishment. Aside from the fire hazards discussed earlier, these deficiencies are: the sanitation problems resulting from overcrowding, which facilitate the spread of disease and tax sanitary facilities; inadequate plumbing; violations of food handling standards at some units; violations of sanitation standards in food processing areas; and inadequate safety measures in TDC's industrial operations.[231]

Although we do not condone TDC's failure to observe the standards applicable to

private industry, we do not find that any of these conditions alone, or all of them together, considered in combination with the overcrowding and security deficiencies, constitute cruel and unusual punishment. The reduction of overcrowding will patently relieve some of these conditions. The others can and should be attacked in a state court action in which the question of applicability of the statutes in question to TDC can be considered directly, not as a peripheral issue in this already complex case.

## IX. APPOINTMENT OF SPECIAL MASTER

The district court's order of reference [232] appoints a special master and provides for the appointment of "several monitors" to help the special master. It imposes on the special master the responsibility of seeing that the district court's decree is implemented, and empowers him to hold hearings, find facts, and make recommendations to the district court concerning TDC's compliance with the decree. As authority for the appointment the district court invoked both Fed.R.Civ.P. 53 [233] and its inherent power as a court of equity.

*Rosenberg v. Fleuti*, 374 U.S. 449, 451–52, 83 S.Ct. 1804, 1806, 10 L.Ed.2d 1000, 1002–1003 (1963) (*federal* statutory issue raised *sua sponte* to avoid reaching constitutional issue); *Peters v. Hobby*, 349 U.S. 331, 338 & n.6, 75 S.Ct. 790, 794 & n.6, 99 L.Ed. 1129, 1137 & n.6 (1955) (issue of compliance with *federal* Executive Order raised *sua sponte* to avoid reaching constitutional issue).

**231.** The deficiencies are discussed in the district court's opinion. 503 F.Supp. at 1374–77.

**232.** *See* note 13 and accompanying text *supra.*

**233.** Rule 53 provides in pertinent part:
MASTERS

. . . . .

(b) REFERENCE. A reference to a master shall be the exception and not the rule. In actions to be tried by a jury, a reference shall be made only when the issues are complicated; in actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.
(c) POWERS. The order of reference to the master may specify or limit his powers and

State by its express terms. Nor has the Texas legislature manifested a clear intention that those statutes should apply to the State. Consequently, they do not apply to TDC. (Emphasis deleted.)

**229.** *Moor v. County of Alameda*, 411 U.S. 693, 715–17, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596, 612–614 (1973); *Fairfax Countywide Citizens Ass'n v. County of Fairfax*, 571 F.2d 1299, 1305 n.18 (4th Cir. 1978); *Aldens, Inc. v. Packel*, 524 F.2d 38, 52–53 (3d Cir. 1975), *cert. denied*, 425 U.S. 943, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Holmes v. Elks Club, Inc.*, 389 F.Supp. 854, 856 (M.D.Fla.1975); 3A J. Moore & J. Lucas, Moore's Federal Practice ¶ 18.07[1.–3], at 18–64 (2d ed. 1982).

**230.** *United Mine Workers v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139, 16 L.Ed.2d at 228 (footnote omitted); *see* Petition for Writ of Certiorari at B–9 n.1, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (reprinting district court opinion, No. 76–0071, D.R.I. July 2, 1979) ("[Defendants'] attack appears confined to federal law. . . . Therefore, the Court sees no reason to raise [a] difficult state law question *sua sponte*. Instead, we leave the question for the state courts to deal with on another day."); *cf., e.g.,*

TDC contends that the appointment of a special master was improper because the district court failed to comply with rule 53, which, according to TDC, codifies and limits a court's authority to appoint a special master.[234] Rule 53(b) states that a district court may appoint a special master "only upon a showing that some exceptional condition requires" the appointment.[235]

The district court stated several reasons for its decision to make the appointment: the difficulty of superintending the implementation of "a comprehensive, de-

tailed plan for the elimination of the unconstitutional conditions found to exist in the Texas prison system"; TDC's "record of intransigence toward previous court orders requiring changes in TDC's practices and conditions"; [236] the "strained" working relations between TDC's lawyers and the plaintiffs' lawyers; TDC's failure to acknowledge even "completely evident" constitutional violations; and TDC's failure to conform its actual practices to its written policies and procedures.[237] The district court did not, as TDC implies, simply rely on the "mere complexity" of the case.[238] More-

may direct him to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the master's report. ...

．　．　．　．　．

(e) REPORT.
(1) *Contents and Filing.* The master shall prepare a report upon the matters submitted to him by the order of reference and, if required to make findings of fact and conclusions of law, he shall set them forth in the report. He shall file the report with the clerk of the court and in an action to be tried without a jury, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.
(2) *In Non-Jury Actions.* In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.
(3) *In Jury Actions.* In an action to be tried by a jury the master shall not be directed to report the evidence. His findings upon the issues submitted to him are admissible as evidence of the matters found and may be read to the jury, subject to the ruling of the court upon any objections in point of law which may be made to the report.

**234.** We reject TDC's suggestion that rule 53 does not permit the post-decretal appointment of a special master. Although rule 53 is concerned primarily with the appointment of a

special master "as a factfinder *in advance of* the court's remedial decree or as an expert to recommend the amount of damages or other remedial relief after a finding of liability," Nathan, *The Use of Masters in Institutional Reform Litigation*, 10 Tol.L.Rev. 419, 428 (1979) (emphasis added), we have implicitly ratified reliance on rule 53 as authority for post-decretal appointment of a special master. *Gary W. v. Louisiana*, 601 F.2d 240, 243–45 (5th Cir. 1979); *accord, Palmigiano v. Garrahy*, 443 F.Supp. 956, 986, 989 (D.R.I.1977).

**235.** One article argues that rule 53's "exceptional conditions" requirement, as interpreted in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), does not even apply in cases like this one. "The *La Buy* restrictions do not ... bar the use of expert special masters in institutional reform cases. The policy considerations that support *La Buy's* interpretation of rule 53 are absent when resort is had to expert masters after the violations of the defendant institution have been determined." Special Project, *supra*, 78 Colum.L.Rev. at 807. This article does, however, state that "the use of masters in such cases must nonetheless meet the general rule 53[(b)] requirement that references to masters be the exception and not the rule." *Id.* at 808; *cf. Gary W. v. Louisiana*, 601 F.2d at 244 (quoting district court's recitation of facts justifying the "exception[al]" act of appointing a special master).

**236.** Cf. *Gary W. v. Louisiana*, 601 F.2d at 245 ("noncompliance with a previous court order") (citing *Newman v. Alabama*, 559 F.2d 283, 289–90 (5th Cir. 1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam)).

**237.** 503 F.Supp. at 1389–90.

**238.** We note, however, that the sheer size of the Texas prison system could be found to pose

over, the court was not required to await the failure or refusal of TDC to comply with the decree before appointing an agent to implement it. Noncompliance may constitute one "exceptional condition" under rule 53,[239] but it is not exclusive.

Furthermore, rule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy.[240] The power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established.[241] Such court-appointed agents have been identified by "a confusing plethora of titles: 'receiver,' 'Master,' 'Special Master,' 'master hearing officer,' 'monitor,' 'human rights committee,' 'Ombudsman,'" and others.[242] The function is clear, whatever the title.

The district court's opinion stated the reasons for the appointment of the special master and his monitors.[243] As it noted, we have previously approved the appointment of such agents to oversee compliance with continuing court orders.[244] Insofar as the special master is to report on TDC's compliance with the district court's decree and to help implement the decree, he assumes one of the plaintiffs' traditional roles, except that, because he is the court's

special difficulties in implementing a remedial decree. As TDC says in its brief: "TDC administers the largest prison system in the United States. With an inmate population of over 29,000 [now over 33,000], TDC is larger even than the Federal Bureau of Prisons, which maintains facilities in every state in the Union." The plaintiffs' brief says that "about one of every ten American prisoners is confined in [TDC] units."

**239.** See *Gary W. v. Louisiana*, 601 F.2d at 244–45; *Gautreaux v. Chicago Hous. Auth.*, 384 F.Supp. 37, 38 (N.D.Ill.1974).

**240.** "Beyond the provisions of [Fed.R.Civ.P. 53] for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir.) (quoting *In re Peterson*, 253 U.S. 300, 311, 40 S.Ct. 543, 547, 64 L.Ed. 919, 924 (1920)), *cert. denied*, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *accord*, *Veneri v. Draper*, 22 F.2d 33, 35 (4th Cir. 1927) ("the power is inherent in the federal courts independently of any statute"), *cert. denied*, 276 U.S. 633, 48 S.Ct. 339, 72 L.Ed. 742 (1928); *Kaufman, Masters in the Federal Courts: Rule 53*, 58 Colum.L.Rev. 452, 462 (1958) ("Over and above the authority contained in rule 53 to direct a reference, there has always existed in the federal courts an inherent authority to appoint masters as a natural concomitant of their judicial power."); *see Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir. 1979); *Powell v. Ward*, 487 F.Supp. 917, 935 (S.D.N.Y.1980), *aff'd per curiam as modified*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *Jordan v. Wolke*, 75 F.R.D. 696, 701 (E.D.Wis.1977); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.*, 42 F.Supp. 225, 227 (D.Conn.1940). *Compare Arthur Murray, Inc. v. Oliver*, 364 F.2d 28, 32 (8th

Cir. 1966) *with* Nathan, *supra*, 10 Tol.L.Rev. at 426–33. *See generally* Note, *Force and Will: An Exploration of the Use of Special Masters To Implement Judicial Decrees*, 52 U.Colo.L. Rev. 105, 109–11 (1980).

**241.** See *In re Peterson*, 253 U.S. at 312–14, 40 S.Ct. at 547–48, 64 L.Ed. at 925; *Newman v. Alabama*, 559 F.2d at 290 (appointment of master and several monitors suggested as "appropriate steps to ensure compliance with [district court's] decree"); *Sun Theatre Corp. v. RKO Radio Pictures, Inc.*, 213 F.2d 284, 293 (7th Cir. 1954); *Kroese v. General Steel Castings Corp.*, 179 F.2d 760, 764 (3d Cir.), *cert. denied*, 339 U.S. 983, 70 S.Ct. 1026, 94 L.Ed. 1386 (1950); Special Project, *supra*, 78 Colum.L.Rev. at 831.

**242.** Special Project, *supra*, 78 Colum.L.Rev. at 826 (footnote omitted); *see* Fed.R.Civ.P. 53(a).

**243.** *See* pp. 1160–1161 *supra*.

**244.** 503 F.Supp. at 1390 (citing *Gates v. Collier*, 501 F.2d at 1321); *see Miller v. Carson*, 401 F.Supp. 835, 841 (M.D.Fla.1975), *aff'd in part, modified in part, and remanded*, 563 F.2d 741, 752–53 (5th Cir. 1977); *Newman v. Alabama*, 559 F.2d at 290; *Gary W. v. Louisiana*, 601 F.2d at 244–45. TDC's reliance on *United States v. City of Parma*, *supra*, is misplaced. In that case, the district court appointed a special master "upon its own motion," and there was "no support ... in the record" for the district court's conclusion that a special master was necessary for the orderly resolution of the case. 661 F.2d at 578. Moreover, the court noted that the appointment of a special master was "antithetical to the recommendations of" the plaintiff's own chief witness on remedy. *Id.* None of these circumstances is present in this case.

agent, he can and should perform his duties objectively.[245]

■■■ In its order of reference, the district court describes the special master's duties as entailing "enormous responsibilities." The decree affects twenty-two TDC units, with a staff of more than 3,000 and housing more than 33,000 inmates.[246] The scope and complexity of the decree and the importance as well as the difficulty of ensuring compliance gave the court adequate reason to invoke its implied authority as a court of equity. Therefore we affirm the district court's decision to appoint the special master and his monitors to observe and report on TDC's compliance.

The special master is also given powers that are quasijudicial. He is permitted to hold hearings and is directed to find facts "concerning the defendants' compliance with the provisions of the Court's Orders and the need, if any, for supplemental remedial action." The order also establishes rules of procedure: the monitors are to make reports of factual observations and to submit them to the special master and the parties. If any party objects, the special master is to hold a hearing, then make his report to the district court. No objection may be filed to the special master's report that could have been filed to the monitor's report preceding it. The special master's findings of fact are to be accepted by the court unless clearly erroneous. In addition, the special master may hold hearings sua sponte without a preliminary monitor's report; and in such instances factual findings in his reports are to be credited unless clearly erroneous. He may, moreover, submit reports based on his own observations and investigations without conducting a hearing. The order of reference does not distinguish between the credit to be given such reports and those submitted after

hearings and accompanied by an evidentiary record.

To fulfill his responsibilities, the special master is given sweeping powers, including "unlimited access" to TDC premises and records as well as the power to conduct "confidential interviews" with TDC staff members and inmates, and to require written reports from any TDC staff member. These powers are unconfined save by the following instructions: he is not to intervene in the administrative management of either TDC or any of its units and he is not to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance.

■■■ The order of reference does not make clear that, in conducting investigations and hearings, the special master and the monitors are not to consider matters that go beyond superintending compliance with the district court's decree. Such an express constraint is appropriate because of the danger that the special master or the monitors may entertain inmate complaints that convert the remedial process into a surrogate forum for new § 1983 actions. In the interests both of prison administration and sound judicial procedure, it should be made clear to the plaintiffs, the special master, the monitors, and the TDC staff that the special master is not an inmate advocate or a roving federal district court. As we have pointed out before,[247] the powers of the court's appointed agents should not intrude to an unnecessary extent on prison administration.

■■■ In one respect, the order of reference is too sweeping. It permits the special master to submit to the district court "reports based upon his own observations and investigations in the absence of a formal

**245.** Special Project, *supra*, 78 Colum.L.Rev. at 828; *see In re Gilbert*, 276 U.S. 6, 9, 48 S.Ct. 210, 211, 72 L.Ed. 441, 442 (1928); *Universal Oil Prods. Co. v. Hall*, 76 F.2d 258, 264 (8th Cir.), *cert. denied*, 296 U.S. 621, 56 S.Ct. 143, 80 L.Ed. 441 (1935).

**246.** *See also* note 238 *supra*.

**247.** *See Miller v. Carson*, 563 F.2d at 753 ("intrusion into state administration of prisons beyond the necessities of the case"); *Newman v. Alabama*, 559 F.2d at 289–90.

hearing before him." [248] This not only transcends the powers traditionally given masters by courts of equity, but denies the parties due process.[249]

Accordingly, the order of reference shall be amended as follows: (1) it should be made clear that the special master and the monitors do not have the authority to hear matters that should appropriately be the subject of separate judicial proceedings, such as actions under § 1983, and that their duties are restricted to those set forth in the order of reference; and (2) unless based on hearings conducted on the record after proper notice, the reports, findings, and conclusions of the special master are not to be accorded any presumption of correctness and the "clearly erroneous" rule will not apply to them.

Finally, the reduction in the scope of the district court's decree directed by this opinion should occasion further inquiry by the district court to determine whether or not there is a continuing need for a staff of six monitors to assist the special master.

## X. CONCLUSION

The Federal Constitution is a charter for all officials, federal and state. All those who wield the power of the sovereign must be equally obedient to its commands and faithful in ensuring its protections.[250] They take the same oath we do—to uphold and to defend it.[251]

The judicial determination has been made. The reparative injunction will require time, skill, and intensive effort. The district court and its special master must respect the right of the state to administer its own affairs so long as it does not violate the Constitution. The state must equally recognize the duty of the district court and the special master as its agent to ensure the restoration of constitutional conditions of confinement in TDC. The implementation of the district court's decree can become a ceaseless guerrilla war, with endless hearings, opinions, and appeals, and incalculable costs. But it is instead to be hoped that, if the state adopts the policy that inmates must be accorded their constitutional rights and that prison officials will not be permitted to indulge in petty practices designed to deny those rights, the period of judicial supervision can more speedily be concluded. To this end, it may not be inappropriate to include the exhortation that constitutional peace is the consummation devoutly to be wished as a result of *Ruiz VII.*

## XI. SUMMARY

11.1 *Uncontested, Settled, and Moot Provisions of the District Court's Decree*

(1) TDC has not appealed the following provisions of the decree: Parts I(C) (quadruple-celling), I(D) (triple-celling), II(C) (use of physical force), IV(A) (disciplinary practices and procedures), IV(C)(1) (in part) (recreation opportunities for inmates on

**248.** Compare *Gary W. v. Louisiana,* 601 F.2d at 245 ("Each party has the right to object ... and to be accorded hearings on objections") *with Newman v. Alabama,* 559 F.2d at 289 ("state counsel were unable to participate or to be heard").

**249.** See *Krinsley v. United Artists Corp.,* 225 F.2d 579, 582 (7th Cir. 1955) ("clearly erroneous" rule applies to "findings of fact made *after* hearings,* by masters") (emphasis added). See generally *Newton v. Consolidated Gas Co.,* 258 U.S. 165, 175, 42 S.Ct. 264, 266–67, 66 L.Ed. 538, 547 (1922); *Tilghman v. Proctor,* 125 U.S. 136, 148, 8 S.Ct. 894, 901, 31 L.Ed. 664, 668 (1888) ("[T]he conclusions of the master, *depending upon the weighing of conflicting testimony,* have every reasonable presumption in their favor, and are not to be set aside or modified unless there clearly appears to have been mistake or error on his part.") (emphasis

added); *Metsker v. Bonebrake,* 108 U.S. 66, 70, 2 S.Ct. 351, 353, 27 L.Ed. 654, 655 (1883) ("evidence taken by the master"); *United States v. S. Volpe & Co.,* 359 F.2d 132, 134 (1st Cir. 1966).

**250.** "The Constitution and laws of the United States are the supreme law of the land, and to these every citizen of every State owes obedience, whether in his individual or official capacity." *Ex parte Siebold,* 100 U.S. 371, 392, 25 L.Ed. 717, 724 (1880); *see Mayo v. Blackburn,* 250 F.2d 645, 648 (5th Cir. 1957), *cert. denied,* 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813 (1958); *Henderson v. United States,* 237 F.2d 169, 175 (5th Cir. 1956).

**251.** U.S.Const. art. VI, cl. 3; 4 U.S.C. § 101; *Connell v. Higginbotham,* 403 U.S. 207, 91 S.Ct. 1772, 29 L.Ed.2d 418 (1971) (per curiam).

Death Row), IV(C)(2) (triple-celling in administrative segregation), IV(D) (vague rules), IX(B)–(D) (specific reporting requirements), and X (attorneys' fees and costs). Thus TDC is deemed to have waived any objections to these provisions.[252] They are, therefore, AFFIRMED.

(2) TDC and the plaintiffs have agreed on, and the district court has approved, a modification of Parts II(A) (security staff hiring and deployment patterns) and II(D) (elimination of building tenders) of the decree. TDC has, therefore, moved, under Fed.R.App.P. 42(b), for dismissal of the portion of its appeal relating to Parts II(A) and II(D) of the decree. We grant this motion and DISMISS its appeal as to these provisions.

(3) Because TDC already has complied with Part I(A)(2) of the decree, which required TDC to review inmates' records and give inmates good time credits, any challenges to that provision are moot and are, therefore, DISMISSED.

### 11.2 General and Procedural Issues

(1) TDC's challenge to the fairness of the trial is DISMISSED.

(2) TDC's challenge to the sufficiency of the district court's findings of fact for appellate review is DISMISSED.

(3) TDC's challenge to the intervention by the United States is DISMISSED.

(4) TDC's challenge to the joinder of the individual members of the Texas Board of Corrections as parties defendant is DISMISSED.

(5) TDC's challenge to the joinder of the Texas Board of Corrections as a party defendant is SUSTAINED and the Board is DISMISSED as a party defendant.

### 11.3 Provisions of the District Court's Decree That Are Affirmed

(1) Part I(B)(1), requiring that TDC file reports with the court on the number of inmates and the space per inmate in TDC's general population cells and dormitories.

(2) Part I(B)(2), requiring that by November 1, 1981, TDC reduce its overall inmate population to a figure equal to twice the number of general population cells, plus the number of inmates who can be housed in dormitories that afford forty square feet of space per inmate.

(3) Part I(F), insofar as it requires that each inmate confined in a dormitory be provided forty square feet of space.

(4) Part II(E), requiring that TDC file a classification plan with the court.

(5) Part IV(B), requiring that TDC preserve a verbatim record of all disciplinary hearings by tape recording them or by some other means.

(6) Part IV(C)(1), requiring that TDC give inmates in administrative segregation the opportunity for regular exercise.

(7) Parts V(A)–(I) and Part V(K), requiring that TDC ensure that its inmates have access to courts, counsel, and public officials.

(8) Part IX(A), insofar as it prescribes reporting procedures pursuant to (a) the first consent decree and (b) provisions of the district court's decree that are affirmed in this opinion.

### 11.4 Provisions of the District Court's Decree That Are Vacated Without Prejudice

(1) Parts I(B)(3)–(4), requiring that by specified dates the overall TDC inmate population be no greater than prescribed maximum figures.

(2) Part I(E), requiring that TDC reduce and then eliminate double-celling by specified dates.

(3) Part I(F), insofar as it requires that each inmate confined in a dormitory be provided sixty square feet of space.

---

252. *In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 439 n.6 (5th Cir. 1982); *Calloway v. Manion*, 572 F.2d 1033, 1037 n.6 (5th Cir. 1978); *Nishida v. E.I. du Pont de Nemours & Co.*, 245 F.2d 768, 773 (5th Cir. 1957), *cert. denied*, 355 U.S. 915, 78 S.Ct. 342, 2 L.Ed.2d 275 (1958); *Nettles v. General Accident Fire & Life Assurance Corp.*, 234 F.2d 243, 247–48 (5th Cir. 1956).

(4) Part II(B), requiring that TDC file with the court a plan and timetable for training new guards and retraining existing guards.

### 11.5 Provisions of the District Court's Decree That Are Vacated

(1) Parts 1(A)(1) and 1(A)(3)–(6), requiring that TDC take prescribed steps relating to the good time, parole, work furlough, and inmate furlough programs, and to community corrections programs and facilities.

(2) Part III, requiring that TDC take various steps to improve the Huntsville Unit Hospital.

(3) Part IV(C)(3), prohibiting double-celling in administrative segregation cells that contain sixty square feet or less.

(4) Part V(J), requiring that inmates be permitted to help other inmates with the preparation of legal matters.

(5) Part VI, requiring that TDC take various steps to improve fire safety and to comply with various Texas health and safety statutes.

(6) Part VII, requiring that TDC comply with prescribed specifications and procedures before constructing either new units for housing inmates or new facilities at existing units.

(7) Part VIII, requiring that TDC reorganize the management of its correctional facilities.

(8) Part IX(A), insofar as it prescribes reporting procedures pursuant to provisions of the district court's decree that are vacated in this opinion.

### 11.6 Appointment of Special Master

(1) The district court's order of reference is AFFIRMED and shall be MODIFIED as follows: (a) it should be made clear that the special master and the monitors do not have the authority to hear matters that should appropriately be the subject of separate judicial proceedings, such as actions under § 1983, and that their duties are restricted to those set forth in the order; (b) unless based on hearings conducted on the record after proper notice, the reports, findings, and conclusions of the special master are not to be accorded any presumption of correctness and the "clearly erroneous" rule will not apply to them.

(2) The district judge shall also reconsider whether or not there is a continuing need for a staff of six monitors to assist the special master.

### APPENDIX A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DAVID RUIZ, ET AL., § | |
| Plaintiffs, § | |
| § | |
| UNITED STATES OF AMERICA, § | |
| Plaintiff- § | |
| . Intervenor § | |
| § | CIVIL ACTION |
| V. § | NO. H–78–987 |
| § | |
| W. J. ESTELLE, JR., ET AL., § | |
| Defendants. § | |

### CONSENT DECREE

Pursuant to the Order of the Court of December 12, 1980, the parties to this cause have met and agreed, through counsel, as hereafter set out, on the provisions of an injunctive Order to be entered regarding the areas covered by their agreement. The Defendants have entered into such agreement with the express understanding that their agreement is not an admission of liability in any sense, and particularly is not an admission of bad faith. Further, Defendants expressly make it known that in their view the agreement hereafter set out in some respects goes beyond minimal, constitutional requirements, but they have entered into said agreement in a good faith effort to terminate this litigation in the areas covered by the agreement and to preclude the need for appeal as to such areas. Defendants, however, in executing this agreement expressly reserve the right to withdraw their consent thereto as to any part of this agreement which is not incorporated in the form hereafter set out in the final Order of the Court to be entered for the purpose of effectuating said agreement.

The major areas covered by this Decree are in full and complete compromise and settlement of any and all claims regarding

such areas and, if Defendants fully comply with the provisions of this Decree, Plaintiffs and Plaintiff-Intervenor agree that neither will request any further relief from the Court on any of these areas except (1) as to the status of the Huntsville Hospital facility and conditions of administrative segregation confinement (extent of recreation; number of prisoners in administrative segregation cells and prohibition of routine use of administrative segregation pending disciplinary hearings) and (2) past, present and future individual claims of class members. Plaintiffs and Plaintiff-Intervenor agree that enforcement of this Decree will be limited to appropriate motions to effectuate the provisions of this Decree. No additional requirements beyond those expressly stated in the Decree will be requested of the Court except to the extent necessary to enforce the provisions of this Decree. Construction of the Decree will be governed by the ordinary and reasonable interpretation of the language therein so as to preclude any strained interpretation, the effect of which is to incorporate standards or relief beyond that agreed to in the Decree.

Accordingly, upon the Stipulation of the parties, dated as of February 10, 1981, Defendants, their successors, agents and employees (referred to collectively as "Defendants") are hereby ENJOINED as follows:

## I. HEALTH CARE

A. Based on a survey of the medical, dental, and psychiatric needs of the Texas Department of Corrections (TDC) population, Defendants will by June 1, 1981, prepare and file with the Court a plan which will assure that prisoners receive necessary medical, dental and psychiatric care from the moment of their arrival in TDC. The plan shall include provision for:

1. prompt identification of immediate needs for medical, dental and psychiatric care;

2. compliance with American Medical Association (AMA) Standards for Health Services in Prison (July 1979), including a plan for implementation;

3. development of standards for architectural, engineering, or equipment needs of prison health care facilities to the extent they are not addressed by the AMA Standards;

4. accreditation by the Joint Commission on Accreditation of Hospitals (JCAH) of the TDC–UTMB Hospital (expected to be operational by May 30, 1982);

5. adequate inpatient and outpatient psychiatric and other psychological care, including the provision of appropriate facilities for that purpose;

6. a system to assure that no prisoner is assigned to do work that is contraindicated for his medical condition; and

7. full access to health care for all prisoners, regardless of segregation status.

B. Defendants shall assure that no nonmedical staff may countermand any medical order regarding a prisoner's treatment, work or other related circumstances.

C. No prisoner shall be denied access to work, recreation, education or other programs or opportunities because of health status unless required for medical reasons as determined by a licensed physician.

D. No prisoner who arrives with medication and a prescription therefor will be deprived of that medication until a licensed physician has examined him and made a medical determination regarding continuation of that medication.

E. Subject to the review of the Court to assure compliance with AMA standards, Defendants shall:

1. Initiate a program of accreditation by the AMA through an initial evaluation by the AMA pursuant to the AMA Standards, *supra*, to begin April 1, 1981 and to be completed by August 1, 1981. The results of that evaluation will be reported in writing to the Court by November 15, 1981. The report will identify areas of compliance and noncompliance and will recommend means of complying.

2. Defendants will then prepare a plan for making TDC health care services

and facilities accreditable, including a schedule for implementation. The plan will be filed with the Court on or before February 1, 1982. Every four months thereafter, until TDC health services and facilities are first accredited, Defendants will report progress in implementing the plan to the Court.

3. As per paragraph A, 3, *supra*, to the extent the AMA Standards may not address architectural, engineering, or equipment needs of prison health care facilities, Defendants will obtain the services of the Texas Hospital Association in developing standards for facilities and equipment. Defendants will file such standards with the Court by January 2, 1982. Thereafter, all TDC medical facilities will be equipped consistent with the standards and all new health care facility construction will be consistent with the standards.

F. By September 1, 1981, Defendants will file with the Court a plan for the development of new or alternative facilities for housing inmates in need of chronic care or acute psychological and psychiatric care.

## II. *SPECIAL NEEDS PRISONERS*

Special needs prisoners shall be defined as those who are mentally retarded, physically handicapped, developmentally disabled or require psychological or psychiatric care. Defendants will provide all special needs prisoners with adequate medical care, adequate living facilities and working conditions (if appropriate), fair discipline, and protection from other prisoners. By September 1, 1981, Defendants will file with the Court a plan which includes provision for:

1. a system for adequately identifying special needs prisoners and for evaluating their needs;

2. individualized treatment and placement plans appropriate for such prisoners' needs and assurances for their implementation;

3. architectural modifications of portions of existing facilities to permit, insofar as possible, physically handicapped prisoners access to programs and activities; and

4. compliance with the procedural requirements of *Vitek v. Jones*, 445 U.S. 480 (1980), for transfers of mentally disturbed prisoners to mental institutions.

## III. *SOLITARY CONFINEMENT*

### A. *Term of Solitary Confinement*

Defendants shall not confine any prisoner to more than one fifteen-day term in solitary confinement without holding a hearing conforming to the requirements of due process procedures which are applicable to prison disciplinary proceedings for each term in solitary confinement beyond the initial term. Consecutive disciplinary punishments are permitted only for violations arising from totally separate incidents.

### B. *Health Precautions*

Defendants shall scrupulously follow Rules 4.3.4.2.4 and 4.3.4.2.7 of the Rules and Regulations and Grievance Procedures of TDC (1975) requiring physical examinations of all prisoners entering solitary confinement and monitoring of the physical and mental health of prisoners confined to solitary.

### C. *Solitary Diet*

Prisoners held in solitary confinement will be fed the same daily full rations as the general inmate population during all the time that they are held in solitary.

## IV. *USE OF CHEMICAL AGENTS*

By April 1, 1981, Defendants shall develop and file clear, concise written standards governing use of chemical agents, including (1) the filing of written reports on each use of chemical agents by TDC personnel and prompt and effective discipline of TDC personnel who violate the standards for use of chemical agents; (2) prompt examination, necessary treatment and necessary decontamination by medical personnel of all prisoners exposed to chemical agents and ventilation of the area in which the agents were used unless additional decontamination

is required by the circumstances; (3) where reasonably feasible, review of the medical records of a prisoner prior to the use of chemical agents on him to ascertain whether the use of chemical agents is medically contraindicated; and (4) prohibition of use of chemical agents on prisoners confined to cells or other similar enclosures who do not present an imminent threat of injury to other persons. Further, the standards shall limit the use of chemical agents to the minimum necessary to prevent escape or imminent serious personal injury or property damage.

## V. *WORK SAFETY AND HYGIENE*

By September 1, 1981, Defendants shall file with the Court a proposed work safety and hygiene plan prepared with the assistance of personnel from the United States Bureau of Prisons. The plan shall cover all TDC prisoner work operations and shall include the following elements: employment and necessary training of work safety and hygiene professionals, or other personnel, with authority to require security and administrative personnel to comply with their recommendations when circumstances are found to exist which pose an imminent or serious threat to health and safety, subject to review of such action at the earliest possible time by the Director of TDC or his designate; adequate record keeping; and safety and hygiene inspections by safety and hygiene professionals or other trained personnel.

## VI. *ADMINISTRATIVE SEGREGATION*

By September 1, 1981, Defendants shall file with the Court a plan setting forth:

1. the circumstances under which prisoners may be confined to administrative segregation;

2. the procedures conforming to the requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974) and *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976), *aff'd* 434 U.S. 1052 (1978); and

3. regular and frequent review of prisoners confined to administrative segregation, including the standards for such review.

## VII. *DEVELOPMENT AND FILING OF PLANS: SPECIAL MASTER*

As required by the Court's Order of December 12, 1980, in developing the plans required by this Decree, Defendants shall address the relevant facts and conclusions contained in the Court's Memorandum Opinion of December 12, 1980. The parties understand that, by entering into the Consent Decree, there has been no agreement whether a Special Master will be appointed, or as to the role of a Special Master, including whether the agreements in this Consent Decree will be part of the reference to a Special Master.

SIGNED and ENTERED this 3rd day of March, 1981.

(s) Wm. Wayne Justice
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding

### APPENDIX B

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID RUIZ, et al., )
 Plaintiffs
UNITED STATES OF AMERICA )
 Plaintiff-Intervenor

vs. ) Civil Action
 No. H–78–987
W. J. ESTELLE, JR., et al., )
 Defendants )

### AMENDED ORDER OF REFERENCE

The Court, having discovered an error in the text of the Order entered on June 18, 1981, modifying its earlier Order of April 20, 1981, appointing a Special Master in this cause, hereby issues this Amended Order of Reference which shall supersede the aforementioned previous Orders.

In a Memorandum Opinion filed on December 10, 1980, the Court announced its intention to appoint one or more Special Masters in this cause. Subsequently, the Court received nominations from all parties and reviewed at length the qualifications of

those persons whose names were submitted for consideration. For the reasons set forth in its earlier opinion, the Court hereby appoints Vincent M. Nathan to serve as Special Master for the Court in this cause.

Mr. Nathan was nominated both by the plaintiffs and by the United States of America. A native Texan, he graduated from the University of Oklahoma College of Law in 1959. He was a member of the faculty of the College of Law of the University of Toledo for 16 years, during the last 10 of which he served as a Professor of Law. He is now engaged in the practice of law in Toledo, Ohio.

Mr. Nathan was appointed in December of 1975 by the United States District Court for the Northern District of Ohio to serve as Special Master in *Taylor v. Perini*, litigation involving the Marion Correctional Institution in Marion, Ohio. In January of 1977, Mr. Nathan was appointed by the same court to serve as Special Master in *Jones v. Wittenburg* [440 F.Supp. 60], litigation involving the Lucas County Jail in Toledo, Ohio.[1] In June of 1979 Mr. Nathan was appointed by the United States District Court for the Southern District of Georgia to serve as Special Monitor in *Guthrie v. Evans*, litigation involving the Georgia State Prison in Reidsville, Georgia. He continues to serve that court as special monitor at this time.

Mr. Nathan is the author of *The Use of Masters in Institutional Reform Litigation*, 10 Tol.L.Rev. 419 (1979), which was republished and distributed by the Federal Judicial Center. He has served and continues to serve as a consultant for the National Institute of Corrections and is an acknowledged expert in the field of implementation of judicial decrees in a correctional setting. In view of his extensive experience and impressive credentials, Mr. Nathan is fully qualified to assume the enormous responsibilities of monitoring compliance with the Court's order in this cause. Because the scope of application of the Court's remedial orders in this case will be infinitely broader than that encountered in any other example of correctional litigation, it is essential that the Special Master be a person with extensive experience and an established record of success.

In addition, the Court will appoint several monitors to assist the Special Master. These monitors will be persons of high professional qualification who are nominated by the Special Master. The Special Master shall supervise the activities of such monitors in accordance with the guidelines announced in *Newman v. Alabama*, 559 F.2d 283, 290 (5th Cir. 1977), *cert. denied*, [438 U.S. 915] 98 S.Ct. 3144 [57 L.Ed.2d 1160] (1978).[2]

The Court grounds its appointment of a Special Master in this case upon two independent sources of authority. First, it relies upon its inherent power to make such an appointment:

Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties... This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause. From the commencement of our Govern-

---

1. Mr. Nathan's reports in *Taylor* were confirmed by the district court and published at 413 F.Supp. 198 (1976), 421 F.Supp. [740] 742 (1976), 431 F.Supp. [566] 570 (1977), 446 F.Supp. [1184] 1186 (1977), 455 F.Supp. [1241] 1255 (1978), and 477 F.Supp. 1289 (1978). His report in *Jones*, which was also confirmed by the district court, was published at 440 F.Supp. 60 (1977). *Taylor* is a rare example of prison conditions litigation which has come to an end, a fact which commends Mr. Nathan's appointment by this Court.

2. The Court does not contemplate the appointment of a separate monitor for each prison in Texas as the Court in *Newman* suggested would be appropriate. The appointment of a separate and qualified monitor for each of Texas' 16 prisons would result in an enormous expenditure of public funds. Rather, the Court contemplates that the Special Master will be able to utilize a staff of perhaps 6 full-time monitors to monitor compliance throughout the Texas system. Such a model will achieve the minimal level of intrusiveness sought by the Court in *Newman*.

ment, it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners and commissioners.

*Ex parte Peterson,* 253 U.S. 300 [40 S.Ct. 543, 64 L.Ed. 919] (1920). The enforcement of its remedial order is a judicial duty which rests with this Court, and it has the inherent power to appoint a Special Master to provide assistance toward this end.

Second, the Court relies upon Rule 53 of the Federal Rules of Civil Procedure in making this reference. In its Memorandum Opinion of December 10, 1980, referred to above, the Court has demonstrated that the appointment of a Master is both necessary and appropriate in accordance with the provisions of Rule 53. The formal fact finding role contemplated by the Rule will be particularly relevant to the Special Master in this case to the extent that he may hold hearings and make factual findings as a result of those hearings for review by the Court.

Pursuant to these bases of authority, the Special Master shall assist the Court by monitoring compliance with the Court's orders in this cause. All actions of the Special Master and any monitors or members of the Special Master's staff will be under the direct control and supervision of the Court. In particular, the Special Master and other persons operating on the Court's behalf shall not intervene in the administrative management of the Texas Department of Corrections or any of its institutions. In addition, the Special Master, his staff and any monitors who are appointed shall not be empowered to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The sole power to direct compliance and to punish noncompliance remains with this Court. The duties of the Special Master, then, will be to observe, monitor, find facts, report or testify as to his findings, and make recommendations to the Court concerning steps which should be taken to achieve compliance. The Special Master may and should assist the

defendants in every possible way, and to this end he may and should confer informally with the defendants and their subordinates on matters affecting compliance. In order to accomplish these objectives, the Special Master shall have the following powers:

1. The Special Master shall have unlimited access to any facilities, buildings, or premises under the jurisdiction or control of the Texas Department of Corrections, and no advance notice of any visit or inspection shall be required.

2. The Special Master shall have unlimited access to the records, files and papers maintained by the Texas Department of Corrections to the extent that such access is related to the performance of the Special Master's duties of monitoring compliance. Such access shall include all Departmental, institutional, and inmate records, including but not limited to medical records. The Special Master may obtain copies of all such relevant records, files and papers.

3. The Special Master may conduct confidential interviews with all staff members and employees of the Texas Department of Corrections. In addition, he may engage in informal conferences with such staff members and employees, and such persons shall cooperate with the Special Master and respond to all inquiries and requests related to compliance with the Court's orders in this case. The Special Master may require compilation and communication of oral or written information relevant to such compliance.

4. The Special Master may conduct confidential interviews and meetings at the institution to which they are confined with any prisoner or group of prisoners under the jurisdiction of the Texas Department of Corrections.

5. The Special Master may attend any formal institutional meetings or proceedings at any institution under the

jurisdiction of the Texas Department of Corrections.

6. The Special Master may require written reports from any staff member or employee of the Texas Department of Corrections with respect to compliance with this Court's orders.

7. The Special Master shall have the full power to order and conduct hearings with respect to the defendants' compliance with this Court's orders. To this end he shall have the power to require the attendance of witnesses, including both prisoners and employees of the Texas Department of Corrections, and he shall exercise all other powers described in subsection (c) of Rule 53 of the Federal Rules of Civil Procedure.

8. The Special Master may select and employ necessary administrative, clerical, and support staff. All such persons as well as the nature of their compensation shall be approved by the Court in advance of their employment. In addition, with advance permission of the Court, the Special Master may hire independent specialists and experts to assist him in fulfilling the responsibilities assigned to him by this Order.

9. In exercising the powers enumerated in paragraphs 1 through 6 above, the Special Master may act by himself, or through monitors appointed by the Court. All actions of such monitors, however, shall be supervised and coordinated by the Special Master in order to accomplish the objectives of this Reference.

The Special Master shall, as he deems necessary or as required by the Court, file reports with the Court in which he shall make findings concerning the defendants' compliance with the provisions of the Court's Orders and the need, if any, for supplemental remedial action. In general, the Special Master's reports to the Court will be based upon reports prepared by individual monitors appointed by the Court as follows:

1. Reports of their factual observations shall be prepared by the monitors appointed by the Court and shall be submitted to the parties and to the Special Master. Any objections to such a report shall be the subject of a hearing before the Special Master upon request of any party. After the parties have had an opportunity to respond or object to a monitor's report, with or without a hearing, the Special Master shall file his report with the Court, including his findings of fact based upon the monitor's report, the record of any hearing, or both.

2. No objection may be filed to the Special Master's report which could have been filed to the monitor's report preceding it. Otherwise, any party may file written objections to the Special Master's report within fifteen days of the filing thereof with the Court. The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings, and may request a hearing or oral argument before the Court.

3. Any request for a hearing before the Court must include a list of witnesses and documents to be presented to the Court. A copy of the objections, proposed findings, and any request for a rehearing shall be served on all parties.

4. The Special Master's findings of fact shall be accepted by the Court unless shown to be clearly erroneous. Any evidence not previously presented to the Special Master in the course of the formal hearing preceding his report will be admitted at a hearing before the Court only upon a showing that the party offering it lacked a reasonable opportunity to present the evidence to the Special Master.

In addition, the Special Master may submit reports based upon hearings held by him in the absence of preliminary reports by monitors, and in such instances the Spe-

cial Master's reports and findings shall be treated in accordance with the provisions of Rule 53 of the Federal Rules of Civil Procedure. The Special Master may also submit reports based upon his own observations and investigations in the absence of a formal hearing before him. In any event, however, the Special Master's findings must be based upon evidence which is made part of the record before the Court.

The Special Master shall be compensated at the rate of Ninety-Five Dollars ($95.00) per hour for services performed in accordance with this Order. Appropriate compensation for members of the Special Master's staff as well as that of monitors shall be established by the Court upon the recommendation of the Special Master and after notice to all parties. All reasonable expenses incurred by the Special Master in the course of the performance of his duties, including but not limited to the rental of office space and equipment in Texas, salaries of staff, long distance telephone, photocopying, printing, travel, data processing, and postage, shall be reimbursed.

The cost of the mastership shall be borne by the defendants as costs in this action. The Special Master shall submit to the Court periodic statements of his time and expenses for review and approval by the Court.

THE DEFENDANTS ARE HEREBY ORDERED to deposit the sum of One Hundred Fifty Thousand Dollars ($150,000.00) with the Clerk of this Court as interim payment of costs, and payments to the Special Master and to monitors shall be made by order of the Court out of such funds. As payments are made by the Clerk, the defendants shall deposit additional sums with the Clerk as the Court may order and direct.

The Special Master may cause copies of this Order of Reference or portions thereof to be posted in any facility under the jurisdiction of the Texas Department of Corrections and may cause such copies to be distributed to inmates within such facilities and to employees of the Texas Department of Corrections.

SO ORDERED this 24th day of July, 1981.

(s) Wm. Wayne Justice
William Wayne Justice
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding

### APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID RUIZ, ET AL., )
 Plaintiffs,

 )

UNITED STATES OF AMERICA, ) NO. H–78–987–CA
 Plaintiff-Intervenor, )

V.
 )

W. J. ESTELLE, JR., ET AL.,
 Defendants. )

### ORDER

On April 14, 1982, the Special Master in the above-styled civil action announced that the parties to the action had agreed to a stipulated modification of Sections II(A) and II(D) of the Amended Decree Granting Equitable Relief and Declaratory Judgment, entered May 1, 1981. Plainly, any alteration of a court's remedial order, suggested by the parties, is subject to approval by the court. Moreover, since this action is a class action, the notice provisions of Rule 23(e), F.R.Civ.P., requires that all class members be notified of the proposed settlement, and that they be given an opportunity to object to its terms. At the close of the hearing on April 14, 1982, the proposed settlement was accepted for review by the court; additionally, the parties were directed to submit to the court a jointly prepared form of notice to the class, and a proposal as to how such notice should be published.

In an order entered April 21, 1982, preliminary approval was given to the settlement. The terms of the modification are fair and reasonable, and protect, in all respects, the rights of the plaintiff class. As indicated in the order of April 21, a just settlement of the issues involved in the

stipulated modification is in the best interests of all parties to this action, not only with respect to these particular issues, but more generally regarding the entire remedial phase of the case.

The order of April 21 also approved a form of notice to the class, as well as a proposed method of publication. Under the terms of this notice, the members were thoroughly apprised of the content of the settlement, and were given an opportunity to challenge its terms, by means of written objections. Class members were directed to file their objections with the clerk of the court, and provide copies to counsel for all parties, and to the Special Master. A hearing was held on June 1, 1982, in Houston, Texas, for the purpose of considering any objections to the proposed settlement filed by members of the plaintiff class.

Numerous inmates filed objections to the stipulated modification of Sections II(A) and II(D) of the Amended Decree. The objections raise serious concerns which merit close attention. With one notable exception, the central thread of the objections is skepticism about defendants' willingness to comply with the terms of the settlement. In view of the history of this litigation, this skepticism is fully understandable. However, as with all portions of the injunctive order in this action, defendants' compliance with the terms of the stipulation will be closely monitored. The Stipulated Modification contains elaborate provisions for ensuring enforcement of its terms. The court is satisfied that this procedure adequately protects the rights of the plaintiff class. Should evidence of noncompliance with the terms of the stipulation be called to the attention of the court, appropriate remedial action will be taken.

One objection filed by a member of the plaintiff class deserves special comment. Originally, notice of the proposed settlement was provided to plaintiff class only in English. Consequently, Spanish-speaking inmates were severely limited in their ability to review and comment on the terms of the settlement. To cure this shortcoming, the parties were directed to arrange for publication of notice in Spanish. Such arrangements were made forthwith, and the court is satisfied that all inmates of the Texas Department of Corrections have been adequately notified of the settlement. Giving consideration to the highly acute and sophisticated objections previously made by many of the members of the plaintiff class, it appears extremely unlikely that any meritorious objections not previously raised will be advanced. Thus, on the basis of the arguments and evidence adduced at the hearing, it appears that the stipulated modification of Section II(A) and II(D) of the Amended Decree should be finally approved.

This action has been remanded temporarily to the district court from the Court of Appeals for the Fifth Circuit, to permit a hearing as to the approval and entry of the stipulated modification of the Amended Decree *vel non*. It appears from the order of remand that entry of final approval will automatically re-vest jurisdiction over the appeal in the Court of Appeals. Nevertheless, the parties are directed to notify the Clerk of the Court of Appeals for the Fifth Circuit that the present order has been entered and to furnish him with a complete record in this matter, including all pleadings and orders relating thereto. The parties are further directed to take any action necessary to insure this action is reinstated in that court. Finally, defendants are directed, in accordance with Section XIV.A of the Stipulated Modification, to file in the Court of Appeals a motion for voluntary dismissal of the portion of their appeal relating to Sections II(A) and II(D) of the Amended Decree.

It is so ORDERED.

SIGNED and ENTERED this 1st day of June, 1982.

(s) Wm. Wayne Justice
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID RUIZ, et al., ) Civil Action
 Plaintiffs, ) No. – H–78–987
UNITED STATES OF AMERICA, ) STIPULATED
 Plaintiff-Intervenor, ) MODIFICATION OF
 ) SECTION II, D AND
vs. ) SECTION II, A OF
 ) AMENDED DECREE
W. J. ESTELLE, JR., et al., )
 Defendants. )
 )

- - - - - - - -

Pursuant to the Court's order of March 29, 1982, the parties have met and discussed Section II,A of the Amended Decree of May 1, 1981, and the matters at issue in the current hearing concerning defendants' compliance with Section II,D of that decree. They stipulate, subject to the Court's approval, that Section II,D and Section II,A of the Amended Decree shall be superseded by the following provisions:

## I. DEFINITIONS.

### A. Support Service Inmate

A Support Service Inmate is an Orderly, a Clerk, a Field Service Worker, or a Turnkey, as those positions are defined herein. Such positions shall be referred to herein collectively as Support Service jobs.

### B. Orderly.

An Orderly is an inmate who is assigned to provide building support services in a housing unit, hallway, infirmary, or in other areas of the institution.

### C. Clerk.

A Clerk is an inmate who is assigned to perform a variety of tasks related to the routine maintenance of nonsensitive unit records. He may provide typing, filing and other related services for staff members to the extent permitted herein.

### D. Field Service Worker

A Field Service Worker is an inmate who has been assigned to agricultural work in a support capacity.

### E. Turnkey.

A Turnkey is an inmate whose job assignment requires him to open and close doors, gates or similar barriers upon direction and instruction of a staff member.

### F. Staff Member

A Staff Member is a current or future civilian or uniformed employee of the Texas Department of Corrections.

### G. Sensitive Materials

A document, record, or information relating to a particular inmate is sensitive if it

(1) relates to his medical, psychiatric, or psychological condition or treatment; provided, however, that the mere designation of an inmate's medical classification (I, II, III, IV or V) is not sensitive information; or

(2) relates to his criminal history, current offense, educational attainment, intelligence quotient, trust fund account, social history, known enemies, disciplinary record, next of kin, or home address.

Otherwise it is nonsensitive.

An inmate's medical, psychiatric and psychological files, and all documents filed therein, an inmate's unit and departmental files, and all documents typically filed therein, travel cards, disciplinary reports, incident reports, use of force reports and grievances are sensitive.

### H. Direct Supervision.

(1) With respect to Orderlies, Field Service Workers, and Turnkeys, direct supervision consists of the performance of a function with the conscious awareness and acquiescence of and within the sight and sound of a staff member.

(2) With respect to Clerks, direct supervision consists of the performance of a function under the circumstances described in Paragraph H(1), supra. In addition, with respect to documents typed by a Clerk, all such documents shall be typed verbatim from written information prepared by a staff member or from records. All documents typed by a Clerk must be reviewed and approved (by signature or initials) by a staff member.

**I.** *Indirect Supervision.*

Indirect supervision shall consist of the following:

(1) The existence of a standing order expressly given by a staff member; or

(2) The existence of general directions delivered by a staff member.

In either case, there shall be regular and periodic observation by a staff member of the performance of the task(s).

**J.** *Bona fide Emergency*

A bona fide emergency is an event which constitutes an immediate and direct threat to the life, health, or safety of one or more individuals caused by natural disasters, medical conditions, fires and similar occurrences, but excluding riots, fights and other inmate disturbances.

**K.** *Full Compliance*

Full compliance with this Stipulation means a determination by the Court that the defendants are in compliance with all the terms of this Stipulation, either on a particular unit or system-wide, as the case may be.

**II.** *PROHIBITION AGAINST THE POSSESSION OR EXERCISE OF SUPERVISORY OR ADMINISTRATIVE AUTHORITY BY INMATES.*

No inmate shall act in a supervisory or administrative capacity or exercise supervisory or administrative authority over other inmates; nor shall any inmate administer disciplinary action against another inmate. Further, no inmate shall be given a position that entails, or authorizes him expressly or impliedly to exercise, such authority.

**III.** *ORDERLY FUNCTIONS.*

An inmate assigned to serve as an Orderly may perform only the following functions:

A. Perform general clean-up duties, such as mopping, sweeping, dusting, polishing, emptying trash, and washing windows;

B. Assist in preparing areas for special programs;

C. Operate windows;

D. Report needed maintenance;

E. Perform routine maintenance functions;

F. Distribute toiletry items, *e.g.*, soap, tooth powder and toilet paper;

G. Provide water to inmates locked in their cells;

H. Carry, inventory, sort, and distribute wearing apparel, laundry, or linens in his assigned housing unit;

I. Under the direct supervision of a staff member, assist in distributing meals to inmates in lock-up status;

J. Assist in loading and unloading of freight or other items;

K. Under direct supervision of a staff member, assist in the distribution of goods in the commissary room, but no inmate shall have access to another inmate's commissary withdrawal sheet or trust fund account report;

L. After a staff member has approved ingress to or egress from a housing unit, record (*e.g.*, on a count board) prisoner movements permitted or ordered by a staff member; provided, however, that a staff member shall initiate and direct all movement in and out of all cells, cellblocks, dayrooms, dormitories and other areas of the unit; and provided further that no inmate may be required to inform another inmate of his destination until after the staff member has authorized his movement; and

M. Perform other tasks at the direction of a staff member, so long as such tasks are consistent with the provisions of Sections II and VII of this Stipulation.

Except for those functions described above that must be performed under the direct supervision of a staff member, all functions of an Orderly must be performed under the direct or indirect supervision of a staff member.

**IV.** *CLERK FUNCTIONS.*

An inmate assigned to serve as a Clerk may perform only the following functions:

A. Update trusty and line force logs, farm reports, slips listing state property, stencils, forms, and similar reports;

B. Update the housing and job assignment board at each unit; provided, however, that all housing and job assignments must originate with and be made directly by a staff member, and a staff member shall fill out all cell assignments;

C. Fill out forms designed or designated by a staff member for ordering supplies and other materials;

D. Under the direct supervision of a staff member, type and file nonsensitive records and documents; and

E. Occasionally perform routine janitorial tasks as described in Sections III A through III E, *supra*, in the immediate area of his assignment and perform other tasks at the direction of a staff member so long as such tasks are consistent with the provisions of Sections I G, II, and VII of this Stipulation.

Except for those functions described above that must be performed under the direct supervision of a staff member, all functions of a Clerk must be performed under the direct or indirect supervision of a staff member.

## V. *FIELD SERVICE WORKER FUNCTIONS.*

Inmates assigned to serve as Field Service Workers may perform only the following functions:

A. Provide water to officers and to inmates;

B. Hook up trailers;

C. Maintain tools and equipment;

D. Perform agricultural work that is performed by other inmates;

E. Under the direct supervision of a staff member,

 (1) Act as a starting point for the work squad;

 (2) Act as last man in the work squad, counting off rows or distances; and

 (3) Work at the pace set by a staff member;

provided, however, that no Field Service Worker may issue any order or instruction to another inmate or be responsible for reporting the pace or quality of another inmate's work; and

F. Perform other tasks at the direction of a staff member so long as such tasks are consistent with the provisions of Sections II and VII of this Stipulation.

Except for those functions described above that must be performed under the direct supervision of a staff member, all functions of a Field Service Worker must be performed under the direct or indirect supervision of a staff member.

## VI. *TURNKEY FUNCTIONS.*

A. Under the direct supervision of a staff member, Turnkeys may possess keys and operate doors and gates for a period of time not to exceed sixty (60) days from the parties' signing of this Stipulation. Thereafter, until a unit comes into full compliance with the terms of this Stipulation pursuant to Section XIII, *supra*, Turnkeys at that unit may operate gates and doors at that unit only as follows:

 (1) Under the direct supervision of a staff member, a Turnkey may operate a door or gate if he is handed the key thereto by a staff member each time the door or gate is opened, and he returns the key to the staff member immediately after locking the door or gate;

 (2) Under the direct supervision of a staff member, a Turnkey may operate a door or gate to the extent that his only function is to push open and/or close (and thus lock) said door or gate after it is unlocked mechanically by a staff member.

B. No Turnkey may open or close a cell door except in the East Building of the Huntsville Unit, and then only under the direct supervision of a staff member; provided, however, that an inmate may, under the direct supervision of a staff member, operate any gate or door only for the purpose of maintenance or repair of locking mechanisms.

C. To the extent that Turnkeys are permitted to have keys in their possession while performing their duties, these keys may not be attached to thongs, straps, or other similar devices; such keys shall be checked out at the beginning and checked in at the end of each shift by the Turnkey with the officer on duty. A key count shall be made at the end of each day by a staff member. No Turnkey shall be allowed to keep any key in his cell or permanently in his possession.

D. From the time a unit is required by this Stipulation to be in full compliance pursuant to Section XIII, *infra,* Turnkeys may not operate gates or doors that have been determined under Section XII, *infra,* to be primary security points. Primary security points are those points which require the presence and actions of a staff member. All such primary security points will be controlled by a staff member, either with a key or through a locking device which he operates. All gates or doors determined under Section XII, *infra,* not to be primary security points may be operated by a Turnkey under direct supervision.

E. No Turnkey shall authorize or deny ingress or egress to or from any area of a unit without a direct and immediate order or signal from a staff member, and a staff member shall initiate and direct all movement in and out of cells, cellblocks, dayrooms, dormitories, and other areas of the unit.

F. Inmates assigned to serve as Turnkeys may also perform the following routine functions:

(1) Load or unload freight or other supplies;

(2) Perform routine janitorial tasks as permitted by Sections III A–E, *supra,* in the immediate area of his assignment; and

(3) Perform other tasks at the direction of a staff member, so long as such tasks are consistent with the provisions of Sections II and VII of this Stipulation.

Turnkeys shall perform the routine functions described in Section VI D only under the direct or indirect supervision of a staff member.

G. On a permanent basis, under the indirect supervision of a staff member, a Turnkey may operate doors and gates through which inmates do not normally pass, which are also not primary security points.

## VII. *IMPERMISSIBLE CONDUCT AND PRIVILEGES.*

A. Forthwith, the defendants shall promulgate and enforce rules to ensure that:

(1) No inmate possesses any weapons;

(2) No inmate abuses other inmates whether physically or otherwise;

(3) No inmate administers any punishment or other form of discipline to other inmates;

(4) No inmate grants or denies another inmate access to any benefit or activity;

(5) No inmate controls the movement or activities of other inmates, except as provided herein;

(6) No inmate, except when on duty and as necessary to perform his legitimate job functions, has any greater access to areas of the unit than does any other inmate;

(7) No inmate escorts another inmate from one place to another, with or without a staff member, except as required by a bona fide emergency;

(8) All inmates are disciplined without regard to job assignment;

(9) All inmates are treated the same regarding the search of their living quarters except as required by Section XI E, *infra,* and no inmate is exempt from a search of his property or his living quarters;

(10) No inmate inventories another inmate's property or searches another inmate, his living area, or his property, and no inmate participates or accompanies a staff member in inventorying or searching another inmate or his property;

(11) No inmate has access to confiscated weapons, alcohol, drugs, or other

forms of contraband, and all contraband is disposed of in accordance with TDC policies;

(12) No inmate keeps in his cell or living area any item prohibited in any other general population cell or living area on that unit;

(13) No inmate gives or is required to give his commissary withdrawal slip or scrip book to another inmate;

(14) No inmate enters or leaves a housing unit without direction from a staff member, who shall personally tally all such movements;

(15) No inmate possesses handcuffs, other forms of restraints, or keys thereto;

(16) No inmate mails or distributes another inmate's correspondence;

(17) No inmate receives money, commissary goods, or services in exchange for any service, apart from payments approved by formal TDC policy;

(18) No inmate has access to sensitive information, and all sensitive materials are kept inaccessible;

(19) Like other assigned inmates, support service inmates are assigned to work a specific shift in a particular, limited location; provided, however, that like other assigned inmates, support service inmates may occasionally be assigned to work different shifts in other particular, limited locations; .

(20) Only an inmate formally assigned as an Orderly, Clerk, Turnkey, or Field Service Worker regularly performs the functions of that specific position;

(21) No inmate is assigned to or, other than in exceptional circumstances, performs more than one Support Service job;

(22) No inmate participates in the taking of any count; provided, however, that a Clerk may record the line turn-out for the field officer;

(23) No inmate enforces departmental or institutional rules or regulations;

(24) It is not a formal or informal part of any inmate's job to

(a) report to staff members any information about inmates or events, including but not limited to rule viola-

tions, work performance, fights, and other disturbances;

(b) break up a fight, come to the aid of staff members or inmates in the case of a confrontation, or maintain order or quiet in any area of a unit;

(c) report any inmate's activities relating to grievances, legal actions, or any attempt to contact public officials, lawyers, or courts;

(d) enforce or monitor work performance standards;

(e) accompany a staff member on his rounds or movements throughout the unit;

(f) determine or exercise influence over his or another inmate's living or work assignment;

(g) assign or delegate work to another inmate;

(h) relay notice of appointments, wake-ups, lay-ins, visits, or arrival of mail; provided, however, that no inmate receiving such notice(s) from any inmate shall be charged with a disciplinary offense or otherwise disadvantaged by failing to respond thereto; and provided further that a non-Support Service inmate may be assigned to give notice of early wake up to other inmates in his housing unit who work the same shift.

(i) relay requests and information to a staff member; provided, moreover, that no inmate shall be required to communicate with a staff member through other inmates;

(j) accompany staff members to the scene of a fight or disturbance; or

(k) take votes on television programs and operate television sets. Television programming shall be selected by a majority of the inmates present to observe. The channel shall be set according to the vote of the majority. Allegations that the vote of the majority was not followed may be brought to the attention of the officer in charge by any inmate, and the officer shall resolve the problem.

B. No Support Service Inmate, by virtue of his assignment to a Support Service job, shall be afforded privileges not afforded to general population inmates. Specifically,

(1) such inmates shall be treated like all other general population inmates with respect to whether and when their cell doors are opened and closed;

(2) such inmates shall not be permitted to wear special jackets, or special or extra clothing that general population prisoners are not provided with or permitted to wear, or be excused from or allowed any special treatment with regard to clothing or TDC dress requirements, except as necessary for the performance of legitimate job functions;

(3) such inmates shall not be permitted to have pets, possessions, hobbies, hobbycraft, or cell furnishings not available to all TDC prisoners;

(4) such inmates shall not be permitted to operate any "store," gambling pool or racket, loan business, or other "business" that general population inmates are not permitted to operate; and

(5) such inmates shall not be provided with any special access to extra food or, except as required by the performance of their legitimate job functions, special meal times.

VIII. *THE REASSIGNMENT OF CURRENT SUPPORT SERVICE INMATES.*

The following shall govern the initial removal of certain inmates occupying (on or about the date of the Court's approval of this Stipulation) positions described in Section II, D of the Amended Decree. For the purpose of this Section only, these positions shall be referred to as "SSI jobs."

A. Within sixty (60) days of the Court's approval of this Stipulation, all inmates assigned to SSI jobs shall be reviewed by the State Classification Committee and removed to the extent required herein. This review shall encompass, at a minimum, the inmate's central file and his unit file. Such inmates may be retained as Support Service Inmates or permitted to perform Support Service jobs only under the following conditions:

(1) They have not abused their position in SSI jobs;

(2) They meet all criteria for selection of support service inmates contained in Section IX, *infra*, of this Stipulation; and

(3) They would not be disqualified from serving as support service inmates by any of the criteria contained in Section X B, *infra*, of this Stipulation, other than Section X B (2), *infra*, but not Section VII of this Stipulation.

Through this review TDC shall select and remove not less than ten per cent (10%) of the inmates assigned to SSI jobs on each unit of the Texas Department of Corrections.

B. In addition, within sixty (60) days of the Court's approval of this Stipulation, the Special Master may require the removal of no more than twenty-five per cent (25%) of the inmates who occupied SSI jobs and performed the functions of housing unit orderlies or similar functions as described in Section II, D of the Amended Decree, major's office count boys or bookkeepers, or countroom count boys or bookkeepers at the following units: Coffield, Darrington, Eastham, Ellis, Ramsey I, Ramsey II, and Retrieve. However, at any particular unit the Special Master may designate for removal no more than fifty per cent (50%) of the inmates assigned to any one of the three job groupings listed above. If the number of inmates so removed exceeds twenty-five per cent (25%) of the total number of inmates employed in a particular job grouping at a particular unit, one-half of the number designated for removal shall be removed within sixty (60) days, and all inmates designated for removal pursuant to this Subsection must be removed within one hundred twenty (120) days.

In designating inmates for removal pursuant to this subsection, the Special Master need not state any reason for such designation. However, the Special Master may recommend that a particular inmate be removed for cause as defined in Subsection A,

*supra*, and state the basis for such recommendation. In the event such a recommendation is made by the Special Master, TDC shall make a good faith investigation into the conduct of said inmate to determine whether removal under the provisions of Subsection A is appropriate.

C. At any time the Special Master may make a recommendation to TDC that an inmate holding an SSI or Support Service job be removed for cause as defined in Sections VIII A, *supra*. Such recommendation shall be non-binding. In the event such a recommendation is made by the Special Master, TDC shall make a good faith investigation into the conduct of said inmate to determine whether removal under the provisions of Subsection A is appropriate.

D. In addition to the removals required by Subsections A and B, *supra*, within one (1) year of the Court's approval of this Stipulation TDC shall transfer an additional twenty-five per cent (25%) of all inmates assigned to SSI jobs and holding positions as or performing tasks similar to housing unit orderlies, countroom count boys or bookkeepers, and major's office count boys or bookkeepers at each of the following units: Coffield, Darrington, Eastham, Ellis, Ramsey I, Ramsey II, and Retrieve. An inmate transferred pursuant to this Subsection D may be immediately assigned to a support service job at his unit of reassignment.

E. An inmate whose removal by TDC for a cause defined in Subsection A, *supra*, is occasioned in whole or in part by possession of a weapon, violence, extortion or aggressive homosexual behavior may not be reassigned to or permitted to perform any function of a Support Service job for five (5) years following his removal. Any other inmate removed under the provisions of Subsections A or B, *supra*, may be assigned to a Support Service job at any unit other than Coffield, Darrington, Eastham, Ellis, Ramsey I, Ramsey II and Retrieve one (1) year after his removal; provided, however, such an inmate may not be reassigned to a Support Service job at any of the named units until one year after full compliance

with the terms of this Stipulation is achieved at that unit.

## IX. CRITERIA FOR SELECTION OF SUPPORT SERVICE INMATES.

A. All assignments to Support Service jobs shall be approved by the State Classification Committee, and the appropriateness of any such assignment shall be documented in the inmate's central file. Copies of any such file and of the inmate's unit file shall be made available upon request to the Special Master and to counsel for plaintiffs and the United States. Inmates shall be selected for Support Service jobs only after a determination, based on their institutional file and behavior, that they are likely to perform their assigned tasks conscientiously and reliably, that they are not likely to abuse or attempt to abuse other inmates, and that they are not likely to exercise or attempt to exercise authority over other inmates.

B. No inmate shall be assigned to a Support Service job if he has been convicted in a court of law or in a prison disciplinary hearing within the immediately previous twelve (12) months of engaging in any of the following conduct while incarcerated in TDC:

(1) Extortion, gaming, acts of assault, theft of personal property, or possession of a weapon;

(2) Use, possession, or buying or selling of narcotics, marijuana, alcohol, other intoxicants, or other drugs;

(3) Escape, attempt to escape, helping another inmate escape or attempt to escape; or

(4) Aggressive sexual behavior.

C. The provisions of this Section IX shall apply only until the full compliance of this Stipulation. Thereafter, defendants shall not use any special selection procedure for assignment to Support Service jobs except as provided in this Stipulation.

## X. CRITERIA FOR REMOVAL OF INMATES FROM SUPPORT SERVICE ASSIGNMENTS.

A. Until full compliance with the terms of this Stipulation is achieved at a particu-

lar unit, all inmates holding turnkey positions at that unit shall be reviewed quarterly by the Warden or his delegate to determine their continued suitability to hold such jobs.

B. An inmate shall be removed from any Support Service job immediately

(1) upon conviction by a disciplinary committee of an offense resulting in loss of good time or reduction in class; or

(2) upon any determination, by disciplinary conviction or otherwise, that the inmate has abused his position or engaged in any conduct prohibited by Section VII, *supra,* or been convicted of a major violation involving conduct listed in Section IX B, *supra.*

An inmate removed under the provisions of Section X B(1) or X B(2) shall be ineligible for any Support Service job within TDC for five years to the extent that his removal was occasioned in whole or in part by possession of a weapon, violence, extortion, or aggressive homosexual behavior, and his records shall be annotated accordingly. An inmate removed pursuant to this Subsection for reasons other than those set out in the immediately preceding sentence shall become eligible for assignment to a Support Service job one year after his removal.

C. An inmate may be removed from a Support Service job at any time

(1) for a job related infraction;

(2) for unacceptable job performance; or

(3) at the discretion of the Warden or Assistant Warden.

An inmate removed pursuant to this Subsection C shall be ineligible for reassignment to a Support Service job for a period of time to be determined by the Warden.

XI. *IMPLEMENTATION AND MONITORING PROCEDURES.*

A. Within thirty days of the Court's approval of this Stipulation, a full job description of each Support Service job shall be prominently displayed in each unit in places accessible to all inmates and shall be reasonably protected from destruction. Such job descriptions shall include the place of work, the duties to be performed, shift assignment, the supervision required, the extent to which the job entails variances from normal institutional routines and practices (e.g. clothing, meal times, open cell door, etc.), and any particular instructions or proscriptions related to the performance of the job. This job description shall be explained by a staff member to each job holder. In addition, a written roster of all inmates assigned to Support Service jobs, by job title, shall be maintained in each unit.

B. Forthwith, the Director of the Texas Department of Corrections shall maintain a system, apart from the current grievance system, for staff members and inmates to report violations of this Stipulation or harassment or retaliation resulting from any such report. The system shall, at a minimum, provide for the following:

(1) All such reports shall go directly to the Director or his designee without interception by unit staff;

(2) All such reports shall be kept confidential except as provided in Subsection (4), *infra* ;

(3) All such reports shall be fairly investigated. All such investigations must be made by personnel from the central office who are separate and apart from unit staff. No unit staff may participate in the investigation except as witnesses. All findings shall be reported to the Director or his designee, who shall make a disposition report of what actions, if any, were taken, state the reasons for taking or failing to take any action, and personally sign the report; and

(4) Copies of all staff or inmate reports, together with the disposition report, shall be provided on a current basis to the Special Master and to counsel for the plaintiffs and the United States at their request.

C. Within thirty days of the Court's approval of this Stipulation, specific inmate and employee disciplinary rules shall be promulgated setting out penalties for inmates and employees who violate the provisions of this Stipulation. Prompt and effective disciplinary action shall be taken against all staff members and inmates who violate or

are responsible for violations of the provisions of this Stipulation.

D. Any regular grievance, disposition of any complaint under Section XI B, *supra*, disciplinary report, or disciplinary conviction regarding a Support Service Inmate will be promptly investigated, and the results of the investigation will be reviewed by the unit Warden for the purpose of determining whether the inmate should remain in a Support Service job.

E. Forthwith and until full compliance with the terms of this Stipulation is achieved at a particular unit, there shall be frequent and regular searches of all cells, dormitories, and other housing areas of Support Service Inmates in that unit. These searches shall be unannounced. Any staff member found to have intentionally given advance notice of any such search or to have aided in the hiding of weapons shall be discharged; any inmate guilty of such actions shall be appropriately disciplined.

F. Forthwith, the Director, Assistant Director or other personnel designated by the Director, shall make regular and periodic unannounced inspections of the units to ensure compliance with all aspects of this Stipulation. A written record of the findings of such inspections shall be maintained in the Director's office.

G. Forthwith, the Director shall issue a memorandum to all staff members and inmates declaring the Department's commitment to abide by and enforce the terms of this Stipulation, and making it clear that all staff members and inmates who do not conform to those requirements will be disciplined.

H. Within thirty days of the Court's approval of this Stipulation, a copy thereof shall be published in *The Echo* and distributed individually to all staff members.

## XII. *STAFFING INCREASES.*

All parties agree that the full implementation of this Stipulation will require a substantial increase in the number of uniformed officers and other staff employed by TDC. They agree that the minimum level of security staffing necessary to achieve full compliance with the terms of this Stipulation will be determined as follows:

(1) By June 1, 1982, TDC will perform a security staffing needs analysis to determine the number of additional staff members it must have at each unit to fill each staff position on each shift so that staff members perform all of the functions, including manning gates and doors, that must under this Stipulation be performed by staff members and not by inmates, and to identify primary and secondary security points.

(2) In addition, and by June 1, 1982, a similar analysis, which will include and reflect consideration of any relevant information submitted by any party, shall be performed by correctional experts selected by the Director of the National Institute of Corrections.

(3) By June 1, 1982 TDC will perform a study of the feasibility and cost of installing locking and unlocking mechanisms at all security gates and doors through TDC.

(4) The results of the two analyses referred to in (1) and (2) above shall be served on all parties and the Special Master, and compared, and an effort shall be made by the parties to resolve informally any differences between them. By July 1, 1982 the agreed upon staffing level and agreed upon primary and secondary security points shall be submitted to the Court for approval and entry of an appropriate order. They shall also be recommended to the Legislature and the Governor.

(5) Failing agreement by the parties, the staffing number and the delineation of primary and secondary security points shall be determined as follows:

(a) By July 15, 1982, plaintiffs shall select one person, and the defendants shall select one person. These two persons shall, by August 1, 1982, select a third person, who shall be experienced in corrections;

(b) Full opportunity shall be provided to the parties to present their views

on the different analyses. The process shall be carried out within the principles of sound mediation and under such rules and procedures as are established by the persons charged with making the decision;

(c) The three persons shall meet, confer, and, by September 1, 1982, determine a staffing number and a delineation of primary and secondary security points based on the two analyses. All parties agree to submit that staffing number and the delineation of primary and secondary security points to the Court for approval and entry of an appropriate order. They shall also be recommended to the Legislature and the Governor.

### XIII. *COMPLIANCE TIMETABLE.*

A. All terms of this Stipulation for which no specific deadline is provided above shall be fully implemented and maintained at the Ramsey I Unit, the Ellis Unit, and the Eastham Unit as quickly as possible and not later than January 1, 1983; at the Coffield, Ramsey II, Retrieve and Darrington Units as quickly as possible and not later than January 1, 1984; and at all remaining units as quickly as possible and not later than January 1, 1985. Actions to achieve implementation may include priority assignment of new staff to these units, reassignment of existing staff from other units, internal reassignment of staff within each of the aforementioned units, and reclassification and reassignment of inmates.

B. On or before January 1, 1983, and on at least a quarterly basis thereafter until full compliance is achieved, the defendants shall submit a report to the Court detailing their progress toward compliance with all the terms of this Stipulation. If any such report reflects that full compliance cannot be achieved in accordance with the timetable established in Section XIII A of this Stipulation, the defendants may apply to the Court pursuant to the *Federal Rules of Civil Procedure* for an extension of time in which to achieve full compliance.

C. The provisions of this Stipulation shall apply to all new units and future additions to existing units except as indicated below:

Security staffing at new units or additions to existing units shall be consistent with the staffing patterns established at comparable units pursuant to Section XII, *supra*; and inmates assigned to new units or additions to existing units will not be permitted to perform functions proscribed by this Stipulation.

### XIV. *PROCEDURAL MATTERS.*

A. The provisions of this Stipulation supersede those of paragraphs II,A and II,D of the Amended Decree entered on May 1, 1981. Within ten days following the approval of this Stipulation by the District Court, the defendants shall file in the United States Court of Appeals for the Fifth Circuit a motion pursuant to Rule 42(b), *F.R.App.P.* for voluntary dismissal of that portion of their pending appeal relating to paragraphs II,A and II,D of the Amended Decree, without prejudice to other portions of their appeal.

B. Any violation of this Stipulation shall be immediately reported to the Special Master, and the party found to be in violation shall be given a reasonable opportunity to correct any deficiency.

C. All prisoner witnesses for the hearing which began March 15, 1982, who were listed by the Special Master shall be given an election to be transferred to the Huntsville Unit, the Diagnostic Unit, the Wynne Unit or the Goree Unit, under the terms set forth in the Stipulation for the Protection of Witnesses as amended. Once an inmate witness elects such a transfer, he shall be entitled to remain at one of those units until the full implementation of this Stipulation is achieved. Any inmate not making such an election within fifteen days after the Court's approval of this Stipulation shall be deemed to have elected not to transfer.

D. This Stipulation shall be submitted to the Court for its approval pursuant to F.R. Civ.P. 23(e).

Dated: 4–20–82 /s/ Richard E. Gray, III

/s/ Brian S. Greig

Attorneys for Defendants

/s/ Steven L. Winter

Dated: 4/14/82 /s/ D. Brorby

Attorneys for Plaintiffs

Dated: 4–20–82 /s/ Jim D. Wiginton, by permission

Dated: 4/20/82 /s/ W. P. Clements, Jr.

William P. Clements, Jr.
Governor of the State of Texas

Dated: 4/18/82 /s/ W. Bradford Reynolds

/s/ Patricia G. Littlefield

Attorneys for Plaintiff-Intervenor

So Ordered this _____ day of _____, 1982.

_____
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding